**STERLING SUFFOLK RACECOURSE LIMITED PARTNERSHIP**

v.

**BURRILLVILLE RACING ASSOCIATION, INC.**

**C.A. No. 92–0154L.**

United States District Court, D. Rhode Island.

Oct. 5, 1992.

---

Matthew F. Medeiros, Flanders & Medeiros, Providence, R.I., E. Randolf Tucker, Michael D. Ricciuti, David B. Crevier, Hill & Barlow, Boston, Mass., for plaintiff.

Peter J. McGinn, Tillinghast, Collins & Graham, Providence, R.I., Kent E. Mast, Kilpatrick & Cody, Atlanta, Ga., for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is before the Court on plaintiff's motion for preliminary injunction to restrain defendant from accepting interstate wagers on horseracing absent plaintiff's approval and on defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff alleges that defendant has accepted and plans to continue accepting wagers on simulcast horseracing at defendant's Lincoln, Rhode Island facility in violation of: (1) the federal Interstate Horseracing Act of 1978 ("IHA"), 15 U.S.C. §§ 3001–3007 (1988); (2) Title IX of the federal Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961–1968 (1988 & Supp.1989), commonly known as the "Racketeer Influenced and Corrupt Organizations Act" ("RICO"); and (3) the Massachusetts Consumer Protection Act, Mass.Gen. Laws Ann. ch. 93A (West 1984 & Supp. 1992) ("Chapter 93A"). Defendant contends that there are no genuine issues of material fact in dispute and that defendant is entitled to have all three claims against it dismissed as a matter of law.

## BACKGROUND

Plaintiff, Sterling Suffolk Race Course Limited Partnership ("Sterling"), has had a license to operate live horseracing at Suffolk Downs, a track in East Boston and Revere, Massachusetts, since November 15, 1991. Sterling conducted live horseraces five afternoons a week, excluding Tuesdays and Thursdays, between January and May 1992, and plans to commence racing again on a similar schedule in October, 1992. Sterling draws its patrons primarily from Massachusetts, New Hampshire, and Rhode Island.

Defendant, Burrillville Racing Association, Inc. ("Lincoln"), is a Rhode Island corporation. Lincoln owns and operates a greyhound track, Lincoln Greyhound Park, located in Lincoln, Rhode Island, approximately fifty miles from Suffolk Downs. Since the summer of 1991, Lincoln has operated an off-track horseracing facility at its Lincoln Greyhound Park, accepting wagers on simulcast horseraces. The simulcast programming consists of television reception at Lincoln of thoroughbred races conducted live at race courses throughout the United States. Lincoln uses telephone and other wire communications to assist in the placing of wagers in a "commonpool" with the out-of-state tracks. Lincoln has shown and accepted bets on horseraces from various tracks including Aqueduct Race Course, Saratoga Race Track, and Belmont Race Track in New York; Meadowlands Park in New Jersey; Santa Anita Race Course in California; and Gulfstream Park in Florida. Accepting wagers on simulcast programming of races from outside of Rhode Island is legal under the laws of Rhode Island,[1] and the State of Rhode Island Department of Business Regulation has approved of the acceptance of wagers on simulcast programming at Lincoln. Similarly, the transmission of live races to off-track offices is permitted under the laws of each of the states from which Lincoln receives such transmissions, and it is lawful in each such state to wager upon the live races. Additionally, Lincoln has obtained the consents of the respective

---

1. R.I.Gen.Laws § 41–11–2 (1991).

state racing commissions, live tracks, and appropriate horsemen's groups, to the extent required under the IHA, 15 U.S.C. § 3004(a). However, despite negotiations between the two entities, Lincoln has never obtained approval from Sterling of Lincoln's acceptance of interstate off-track wagers on simulcast horseraces.

Sterling argues that Lincoln's acceptance of interstate wagers on simulcast horseraces is unlawful. Sterling further contends that such activity has harmed and will continue to harm Sterling's business by wrongfully drawing patrons to Lincoln who would otherwise bet on live horseracing at Suffolk Downs. Lincoln responds that all such claims should be dismissed.

After hearing arguments, the Court took the matter under advisement, and is now poised to decide the case. For the reasons that follow, plaintiff's motion for preliminary injunction is denied and defendant's motion for summary judgment is granted.

## DISCUSSION

### I. PRELIMINARY INJUNCTION

Addressing plaintiff's motion first, it is well established that for a preliminary injunction to issue the court must find four conditions: (1) the plaintiff has demonstrated a likelihood of success on the merits; (2) the plaintiff will suffer irreparable harm in the absence of injunctive relief; (3) the injury the plaintiff would suffer from a denial of injunctive relief is greater than the injury the defendant would suffer if injunctive relief were granted; and (4) the public interest will not be adversely affected by the granting of injunctive relief. *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991); *Kleczek v. Rhode Island Interscholastic League,* 768 F.Supp. 951, 953 (D.R.I.1991). The moving party must demonstrate that these factors militate in its favor. In this instance, Sterling has failed to so persuade the Court.

Of the four factors, demonstrating a probability of success on the merits is the most "critical." *Narragansett Indian Tribe,* 934 F.2d at 6; *Kleczek,* 768 F.Supp. at 953. Although "a party need not *prove*

its claims at the preliminary injunction stage," Sterling has not even shown that it is *"likely* to be able to prove its claims later." *Kleczek,* 768 F.Supp. at 953. In fact, the Court is convinced that, even viewing the facts in the light most favorable to Sterling, as is required for granting summary judgment in favor of Lincoln, *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991), Sterling's claims must be denied as a matter of law.

In determining Sterling's likelihood of success on the merits, the Court must analyze each of Sterling's three independent claims. Although a likelihood of success on any one of these three claims could have satisfied the first prong of the preliminary injunction analysis, the Court concludes that all three lack merit.

### A. *The Interstate Horseracing Act*

■ Sterling first claims that it will likely show that Lincoln has violated the IHA. However, as explained below, the Court finds that Sterling has no standing to bring suit under the IHA.

The IHA regulates wagering at off-track betting facilities, requiring the off-track offices to elicit consent or approval from various entities before accepting wagers on horseraces being run in other states. The law prohibits accepting such interstate off-track wagers except with consent from four parties: (1) the host racing association, which conducts the horseraces subject to the interstate wagers; (2) the horsemen's group, which represents the majority of owners and trainers with horses in races subject to the interstate wagers; (3) the host racing commission, which has jurisdiction to regulate the conduct of racing within the state in which the live horseraces occur; and (4) the off-track racing commission, which has jurisdiction to regulate off-track betting in the state in which the off-track betting occurs. 15 U.S.C. § 3004(a). It also states:

In addition to the requirement of subsection (a) of this section, any off-track betting office shall obtain the approval of—

(A) all currently operating tracks [2] within 60 miles of such off-track betting office; and (B) if there are no currently operating tracks within 60 miles then the closest currently operating track in an adjoining state. 15 U.S.C. § 3004(b)(1). Sterling argues that, as it is a "currently operating track[ ] within 60 miles of the off-track betting office" at Lincoln ("60–mile track"), Lincoln violates the IHA by accepting interstate wagers without obtaining Sterling's approval.

Nonetheless, as Sterling admits, the IHA fails to provide 60–mile tracks a cause of action. Sixty-mile tracks are conspicuously absent from the list of entities explicitly provided a right to sue under the law. The enforcement provision of the law states: "The host State, the host racing association, or the horsemen's group may commence a civil action against any person alleged to be in violation of this chapter, for injunctive relief to restrain violations and for damages in accordance with section 3005 of this title." 15 U.S.C. § 3006. Sterling, therefore, argues that the Court should find an implied private right of action affording Sterling the opportunity to commence a civil action under the IHA. Courts imply private rights of action in federal statutes where they find Congressional intent to create such a private remedy. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). However, "[a] formidable obstacle confronts litigants who attempt to assert implied rights of action," *Royal Business Group v. Realist, Inc.,* 933 F.2d 1056, 1060 (1st Cir.1991), for " '[the Supreme] Court has long since abandoned its hospitable attitude towards implied rights of action.' " *Arroyo–Torres v. Ponce Federal Bank* 918 F.2d 276, 278 (1st Cir.1990) (quoting *Thompson v. Thompson,* 484 U.S. 174, 190, 108 S.Ct. 513, 521–22, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring in judgment)).

In determining the existence of an implied private right of action, courts must engage in statutory construction. *See*

*Touche Ross & Co.,* 442 U.S. at 568, 99 S.Ct. at 2485. "The ultimate question ... is whether Congress intended to create a private remedy" in favor of this plaintiff. *Northwest Airlines v. Transport Workers Union of America,* 451 U.S. 77, 91, 101 S.Ct. 1571, 1580 67 L.Ed.2d 750 (1980). In the seminal *Cort v. Ash* decision, the Supreme Court set forth four factors to guide this analysis: (1) whether the plaintiff is one of the class for whose "especial benefit" the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny such a remedy; (3) whether the remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law in an area basically the concern of the states so that it would be inappropriate to infer a cause of action based solely on federal law. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975); *see also, e.g., Nashoba Communications v. Danvers,* 893 F.2d 435, 439 (1st Cir.1990); *Latinos Unidos De Chelsea En Accion v. Secretary of Housing & Urban Dev.,* 799 F.2d 774, 792 (1st Cir.1986).

In 1986, the New Hampshire District Court, applying the foregoing analysis, found that the IHA contained no implied private remedy for 60–mile tracks. *New Suffolk Downs Corp. v. Rockingham Venture,* 656 F.Supp. 1190 (D.N.H.1987). After analyzing the *Cort* factors, this Court arrives at the identical conclusion.

### 1. Especial Benefit

Turning first to the "especial benefit" question, this Court agrees with the New Hampshire District Court (Judge Divine) that 60–mile tracks were "not one of the class for whose especial benefit the Act was passed." *New Suffolk Downs,* 656 F.Supp. at 1194. Admittedly, the national legislature intended the IHA to help 60–mile tracks compete with nearby off-track betting facilities. However, the "especial

**2.** " '[C]urrently operating tracks' means racing associations conducting parimutuel horseracing at the same time of day ... as the racing associ-

ation conducting the horseracing which is the subject of the interstate off-track wager." 15 U.S.C. § 3002(14).

benefit prong" requires that "plaintiff and his class be the intended, primary beneficiaries." *Cohen v. Massachusetts Bay Transp. Auth.*, 647 F.2d 209, 212 (1st Cir. 1981). Clearly, currently operating tracks do not occupy this status. Rather, as discussed below, the language, structure, and legislative history of the statute suggest that the IHA was designed primarily to protect the proprietary interests of those producing the live horseraces—the horsemen who own the horses running in the races, the host racing association which conducts the horseraces subject to the interstate wagers, and the host state which regulates and earns revenue from the live races. As the New Hampshire Court noted, "[T]he statute was created for the 'especial benefit' of those groups to insure that states which desire to run off-track betting operations do not pirate the races of the host state without providing adequate compensation therefor." *New Suffolk Downs*, 656 F.Supp. at 1193.

Further, even if the Court agreed that Congress designed section 3004(b) primarily to provide special protection for 60–mile tracks, such a finding, "while indirectly evidencing legislative intent, is not dispositive of the issue." *Pacheco v. Raytheon Co.*, 777 F.Supp. 1089, 1091 (D.R.I.1991) (citing *Transamerica Mortgage Advisors (TAMA) v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979)). Accordingly, even if Sterling has an interest under this isolated section of the statute, the other three *Cort* factors indicate that Congress did not intend to provide 60–mile tracks with a private remedy. Rather, Congress, it is likely, intended section 3004(b) to give 60–mile tracks some leverage in informal negotiations to convince those with proprietary interests to withhold consent.

## 2. Congressional Intent

The Court next turns to the key inquiry regarding congressional intent to create a private remedy. Interpretation of legislative intent begins with the words of the statute. *Touche Ross & Co.*, 442 U.S. at 568, 99 S.Ct. at 2485. Here, the Court is greatly influenced by the explicit language of the IHA's enforcement and relief sections, provisions on which the Court should place particular emphasis. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981). The Act clearly delineates the three parties entitled to bring an action for damages or injunction, 15 U.S.C. § 3006, and anyone violating the IHA is liable for damages only to the identical three parties, 15 U.S.C. § 3005. Where, as here, "a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies." *Karahalios v. National Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 533, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989). Further, in view of these provisions expressly granting remedies to other private parties, it is unlikely that " 'Congress absentmindedly forgot to mention an intended private action' " in favor of 60–mile tracks. *TAMA*, 444 U.S. at 20, 100 S.Ct. at 247 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting)).

Next, looking at the damages section, 15 U.S.C. § 3005(1)–(2), the formula set forth for calculating damages is based solely on the betting systems in use at either the host racing association or the off-track betting office. The section ignores the type of losses a 60–mile track could incur. This Court agrees with the New Hampshire District Court that "if Congress intended that tracks within sixty miles of the off-track betting location were to recover damages, they would have adopted a formula to include damages sustained by such tracks." *New Suffolk Downs*, 656 F.Supp. at 1194. Along similar lines, venue for any action commenced under the IHA is appropriate only in the district court of the host state or the off-track state, 15 U.S.C. § 3007(b), while concurrent jurisdiction of state courts is provided only in the host state or the off-track state, 15 U.S.C. § 3007(c). By failing to grant jurisdiction and venue based on the state of a 60–mile track, the IHA, once again, manifests a disregard for the ability of 60–mile tracks to sue under the statute.

3. Legislative Scheme

The third *Cort* factor also weighs against implying a private remedy for Sterling. Again agreeing with the Court in *New Suffolk Downs*, this Court finds that "it would be inconsistent with the underlying purposes of the legislative scheme to imply such a remedy in behalf of [a 60–mile track]." *New Suffolk Downs*, 656 F.Supp. at 1194. The legislative history reveals that the "most important feature of this legislation is that it establishes the proprietary relationship of the horseracing industry: that is, the horsemen and the racetracks, over its own races." 124 Cong.Rec. S31553 (daily ed. Sept. 26, 1978) (statement of Sen. Magnuson, one of the primary proponents of the IHA). Concerned about off-track betting offices pirating live horseraces, Congress designed the IHA to "protect[ ] the ordinary contractual process," *id.* (statement of Sen. Huddleston), and ensure that the track operators and the horsemen receive proper compensation for their product. Additionally, as discussed below, the IHA acknowledges the importance of state control over wagering within their borders. Although Congress intended that 60–mile tracks play some role in the off-track betting process, granting them the right to sue would frustrate the primary purposes of the Act.

If granted a private remedy, 60–mile tracks could unilaterally destroy an off-track betting facility by withholding approval and suing for an injunction. As nothing in the statute requires that 60–mile tracks grant approval, if they had a private remedy, they might be able to withhold approval unreasonably and still receive injunctive relief. Such a situation would allow a third party to undermine the contractual process between the parties with a proprietary interest and the potential buyers, preventing the sale of the product entirely. The 60–mile tracks could also exploit a "veto power" by using it as a weapon to squeeze high fees in return for grants of approval. Importantly, the unilateral veto, which requires no state concurrence, could also interfere with state control over horseracing. Through the self-serving acts of refusing to grant approval and seeking an injunction, a 60–mile track could effectively block a state decision to allow, and earn revenue from, the interstate sale of races occurring live in their state or the conducting of off-track betting within state borders.

The absence of an intent to grant a private remedy to 60–mile tracks does not suggest that Congress included section 3004(b) frivolously, however. Rather, Sterling and other 60–mile tracks can employ their approval rights productively in a manner consistent with the legislative scheme. In negotiations with host racetracks or horsemen's associations, the approval rights afford 60–mile tracks leverage to persuade the proprietary parties to withhold consent absent the track's approval. In fact, Sterling may well have utilized this approach successfully in this instance. Lincoln claims that Sterling secured the cooperation of the Los Angeles Turf Club, which suspended its agreement to provide programming from Santa Anita, and the Florida Horsemen's Benevolent and Protective Association, Inc., which terminated programming from Calder Race Course. Sterling's efforts may also have impeded Lincoln's ability to obtain simulcast programming from other tracks, including Arlington Race Track, Sportsman's Park, Oaklawn, and Pimlico. Similarly, the *New Suffolk Downs* Court noted that "[w]hen Suffolk withheld its consent to Rockingham to operate off-track betting, the New Hampshire Parimutuel Commission denied consent to Rockingham to do so." *New Suffolk Downs*, 656 F.Supp. at 1193. Although a New Hampshire state court later overruled the Commission's decision, finding that 60–mile tracks' approval was unnecessary, this incident is demonstrative of the cooperation the IHA attempts to engender among racing commissions in various states. *See id.* at 1193–94 & n. 10.

4. Traditional State Jurisdiction

Finally, the Court is convinced that "inasmuch as the Act is a limited area of federal exercise of jurisdiction over an area primarily reserved to the states, it would be inappropriate to infer a cause of action in be-

half of [60–mile tracks] based on this statute." *Id.* at 1194. States have traditionally maintained strict control over gambling within their borders. Congress explicitly recognizes the vested interests of the states in horseracing in the language and history of the IHA. For example, the very first line of the statute explains, "States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). Similarly, the Senate Report expresses the view that "[gambling] matters are generally of State concern and that the States' prerogatives in the regulation of gambling are in no was [sic] preempted by this or other Federal law." S.Rep. No. 1117, 95th Cong., 2d Sess. 3 (1978), *reprinted in* 1978 *U.S.C.C.A.N.* 4132, 4144, 4146. Acknowledging that the federal government was intruding into an area generally left to the states, Congress intended to do so with the least interruption possible. Granting an implied private remedy would unnecessarily and inappropriately transfer partial control over betting on horseracing from the states to private third parties.

In sum, the Court finds insufficient evidence from which to infer Congressional intent to grant a private remedy for currently operating tracks. The Court thus refuses to ignore the plain language of the statute by creating a remedy which Congress did not intend to grant. Consequently, Sterling has no standing to bring this action under the IHA.

B. *Racketeer Influenced and Corrupt Organizations Act.*

 Arguing that Lincoln's unapproved acceptance of wagers on certain simulcast horseraces constitutes a pattern of indictable activity under federal gambling laws, Sterling asserts that it will likely succeed on the merits of its independent claim that Lincoln has violated RICO. RICO prohibits persons from using income gained through a pattern of racketeering activities in the operation of any enterprise that is engaged in interstate commerce.[3] In addition to imposing criminal penalties, RICO affords private parties who have been injured by the prohibited conduct a right to commence civil suits in federal court. 18 U.S.C. § 1964(c). The Court concludes that Sterling's claim under this section lacks merit and constitutes inappropriate bootstrapping. Sterling attempts to use a law Congress designed to deter criminal organized crime as a vehicle to attack activity that Congress clearly intended to be subject to strictly civil repercussions. More specifically, Sterling has not shown that Lincoln's behavior amounts to "racketeering activity" and has failed to request relief that this Court can grant it under the statute.

Sterling's greatest obstacle involves an inability to prove that Lincoln received income from a "pattern of racketeering activity." Among the numerous activities defined by the statute as "racketeering activity" is "any act which is indictable under ... title 18, United States Code: ... section 1084 (relating to the transmission of gambling information)." 18 U.S.C. § 1961(a). Section 1084 states, in part:

Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest ... shall be fined not more than $10,000 or imprisoned not more than two years, or both. 18 U.S.C. § 1084(a).

However, the law provides an exception for, *inter alia:*

the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State ... where betting on that sporting event or contest is legal into a State ... in

---

3. The relevant RICO section states, in part:
 It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any

part of such income, ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. 19 U.S.C. § 1962(a).

which such betting is legal. 18 U.S.C. § 1084(b).

Sterling contends that (1) section 1084 applies to Lincoln's unapproved acceptance of wagers on simulcast horseraces, (2) the exception in section 1084(b) does not apply in this situation, (3) Lincoln's behavior is indictable under section 1084, and (4) therefore Lincoln's conduct constitutes "racketeering activity" under RICO. First, Sterling argues that Lincoln engages in the business of betting through its acceptance of wagers on simulcast horseraces. Sterling further contends that Lincoln knowingly uses a wire communication for the interstate transmission of bets or information assisting in the placing of bets by sending and receiving "common-pool" betting information via wire transmissions. Second, Sterling argues that, despite the approval of the relevant states' laws, the IHA renders the acceptance of interstate wagers on simulcast horseraces without the approval of 60–mile tracks illegal in all states under federal law. Therefore, the argument goes, the exception in section 1084(b) fails to apply.

Even accepting as correct the contention that section 1084 applies initially, the Court is not satisfied that Lincoln's activities are indictable under section 1084 or constitute "racketeering activity" under RICO. Importantly, Sterling's argument misunderstands the purposes and appropriate applications of the IHA, section 1084, and RICO. Sterling would have the Court determine that any violation of the IHA exposes the wrongdoer to criminal fines and imprisonment under section 1084 as well as civil treble damages or criminal penalties under RICO. Interpreting the section 1084(b) exception as excluding off-track betting solely as a result of a violation of the IHA would convert the civil violation into a criminal one. The Court believes that such an interpretation ignores Congress's intentions in enacting section 1084

and the IHA, and, thus, refuses to reach this inconsistent result.

In adopting section 1084, Congress did not intend to criminalize acts that neither states nor Congress desired to be treated as criminal. The legislative history of the Act makes it clear that Congress respected the rights of individual states to sanction off-track betting within their borders, so long as the state where the event occurred live likewise permitted wagering on the event. In fact, the legislature drafted the exception in 1084(b) specifically to accommodate the desire of some states to legalize off-track betting.[4]

Turning to the IHA, as discussed above, Congress clearly intended this Act to have purely civil consequences. Congress carefully designed the enforcement and remedies sections to exclude the possibility of government involvement and criminal penalties. Thus, the congressional reports emphasize, "While this bill provides for the regulation by the Federal Government of interstate wagering on horseracing, there will be no Government enforcement of the law. Any person accepting an interstate wager other than in conformity with the act will instead be civilly liable in a private action...." S.Rep. No. 1117 at 4146; H.R.Rep. No. 1733, 95th Cong., 2nd Sess. 3 (1978)

The Court refuses to ignore the clear congressional intent to respect state gambling laws and not criminalize IHA violations. Thus, the Court concludes that Sterling's RICO claim has no merit in this case.

█ Additionally, even if Sterling had sufficiently raised a RICO claim, Sterling has no right to injunctive relief under the RICO statute. Sterling's standing to bring this suit would arise under RICO section 1964(c), which states:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue there-

---

4. The House Report, explaining section 1084(b) as of 1961, noted:

> Phrased differently, the transmission of gambling information on a horserace from a State where betting on that horserace is legal to a State where betting on the same horserace is legal is not within the prohibitions of the bill. Since Nevada is the only State which has legalized offtrack betting, this exemption will only be applicable to it. H.R. No. 967, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S.C.C.A.N. 2631, 2632.

for in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. 18 U.S.C. § 1964(c).

Importantly, this section, unlike section 1964(b) under which the United States may bring a RICO suit,[5] contains no express provision for an injunctive remedy. Courts disagree about whether section 1964(c), combined with section 1964(a), which grants district courts of the United States jurisdiction to prevent RICO violations by ordering, among other measures, equitable relief, allows private civil RICO plaintiffs to obtain injunctive relief. A number of courts have determined that such a remedy exists for private parties. *See, e.g., Chambers Dev. Co. v. Browning–Ferris Indus.,* 590 F.Supp. 1528, 1540–1541 (W.D.Pa. 1984); *Aetna Casualty & Sur. Co. v. Liebowitz,* 570 F.Supp. 908, 909–911 (E.D.N.Y. 1983), *aff'd on other grounds,* 730 F.2d 905 (2d Cir.1984). However, a greater number have arrived at the contrary conclusion. *See, e.g., In re Fredeman Litig.,* 843 F.2d 821, 828–830 (5th Cir.1988); *Religious Technology Ctr. v. Wollersheim,* 796 F.2d 1076 (9th Cir.1986), *cert. denied* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). The First Circuit, while not yet addressing this issue directly, has expressed doubts as to the availability of injunctive relief in private civil RICO actions. *Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 848 (1st Cir.1990).

In 1986, the Ninth Circuit set forth a comprehensive discussion of the issue in *Wollersheim,* 796 F.2d 1076. Summarizing, the *Wollersheim* Court found: (1) The express inclusion of an injunctive remedy for the United States in § 1964(b) contrasted with only a damages remedy for private parties in § 1964(c) implies the exclusion of a private injunctive remedy, *id.* at 1083; (2) Congress's repeated rejection of language expressly authorizing injunctive relief for private plaintiffs in favor of language explicitly granting private action only for tre-

ble damages suggests legislative intent to exclude a private injunctive remedy, *id.* at 1084–86; and (3) the language of section 1964(c) was modeled on that contained in section 4 of the Clayton Act, 15 U.S.C. § 15(a), which courts have held precludes private injunctive relief. Congress was aware that the Clayton Act included an express authorization of private injunctive remedy in section sixteen of that Act. If it had desired to bestow this remedy on civil RICO plaintiffs, Congress would likely have "completed the analogy between civil RICO and the antitrust laws by including in civil RICO a private equitable relief remedy like section sixteen of the Clayton Act," *id.* at 1086–87.

This Court finds the *Wollersheim* analysis persuasive. In light of the sound reasoning in *Wollersheim* and the First Circuit's previously expressed doubts as to the authority of district courts to grant injunctive relief to private parties under RICO, this Court concludes that it would lack authority to grant Sterling the relief for which it prayed even if Sterling was otherwise entitled to it.

## C. *Chapter 93A*

■ Sterling also argues that it will likely succeed in obtaining an injunction on the merits of its claim based on Chapter 93A, the Massachusetts Consumer Protection Act. Chapter 93A prohibits unfair and deceptive trade practices occurring primarily and substantially within the Commonwealth of Massachusetts. Mass.Gen.Laws Ann. ch. 93A, §§ 2, 11. Sterling contends that Lincoln's unapproved acceptance of interstate wagers on simulcast horseraces contravenes the IHA and congressional policy protecting 60–mile tracks and thus constitutes the type of unfair practice prohibited by Chapter 93A. In addition, Sterling attacks a variety of Lincoln's alleged actions in negotiating with Sterling and other racetracks as unfair and deceptive practices.

---

**5.** 18 U.S.C. § 1964(b) states:
> The Attorney General may institute proceedings under this section.... Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions ... as it shall deem proper.

The Court's analysis of the Massachusetts Consumer Protection Law reveals that it is unlikely Sterling will be able to prove that Lincoln violated Chapter 93A. Sterling's primary claim implicates actions that did not occur "primarily and substantially within" Massachusetts while the other actions it attacks failed to give rise to any injury.

In its original complaint and brief, Sterling argues that Lincoln's unapproved acceptance of wagers on horseraces simulcast at the same time of day as live horseraces at Suffolk Downs violates the federal IHA and is thus unfair. Sterling further claims that Lincoln deceptively distributed a letter falsely stating that Sterling had approved Lincoln's simulcasting. However, as Sterling, which changes the factual basis of its complaint in its reply brief, seems to implicitly recognize, Chapter 93A does not apply to these actions. The Massachusetts statute states, "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." *Id.* at § 11. Although the defendant bears the burden of proving that the actions and transactions did not occur primarily and substantially within Massachusetts, *id.*, Lincoln will likely meet this burden.

Numerous Massachusetts cases have analyzed whether actions complained of "occurred primarily and substantially within the commonwealth." *See, e.g., Bushkin Assocs. v. Raytheon Co.*, 393 Mass. 622, 637–39, 473 N.E.2d 662, 671–72 (1985); *Makino, U.S.A. v. Metlife Capital Credit*, 25 Mass.App.Ct. 302, 308–11, 518 N.E.2d 519, 522–24 (1988). The First Circuit, interpreting Massachusetts cases, explained that courts may assess the totality of the circumstances with a pragmatic, functional approach. *Clinton Hosp. Ass'n v. Corson Group*, 907 F.2d 1260, 1265–67 (1st Cir. 1990). It set forth three important factors to consider: (1) where the defendant committed the deceptive or unfair practice; (2) where the plaintiff received and acted upon the deceptive or unfair statement; and (3) the situs of the plaintiff's loss due to the unfair or deceptive practice. *Id.*

Applying this analysis to the present case, the Court is convinced that neither Lincoln's allegedly unfair practice of accepting wagers on simulcast horseraces run contemporaneously with Suffolk Downs' races nor Lincoln's alleged act of disseminating a letter indicating Sterling's approval occurred "primarily and substantially" in Massachusetts. First, and most importantly, as Lincoln only simulcasts and accepts wagers on horseraces at its Rhode Island facility, the alleged unfair and deceptive acts of simulcasting and accepting wagers occurred and will occur in Rhode Island, not Massachusetts. Additionally, assuming that Lincoln disseminated a letter to racetracks running live horseraces, this letter must have been written in and sent from Rhode Island and delivered to racetracks in various states, none of which were in Massachusetts.

■ The two other factors considered by the First Circuit fail to alter the result. The second consideration, where the plaintiff received and acted upon the unfair statement, is inapplicable to both the acceptance of interstate wagers and the alleged dissemination of letters. Neither involved representations intended to sway, or with the effect of swaying, Sterling into action or inaction. Finally, while Sterling's loss of patronage, if any, occurred in Massachusetts, this does not persuade the Court that Chapter 93A applies. Although the place of loss was once the primary factor assessed in this determination, the Massachusetts Appellate Court has downplayed the significance of the site of loss in recent years. That court explained, "[I]f the place of injury were the only test, practically no case involving a Massachusetts plaintiff would be exempt from c. 93A status, no matter how negligible the defendants' business activity in this State." *Makino*, 25 Mass.App.Ct. at 309–310, 518 N.E.2d at 523 (citing *Goldstein Oil Co. v. C.K. Smith Co.*, 20 Mass.App.Ct. 243, 249 n. 7, 479 N.E.2d 728, 731 n. 7 (1985)). Thus, considering the totality of the circumstances, Lincoln has shown that the actions complained

of did not occur "primarily and substantially" within Massachusetts.

Searching for actions that occurred in Massachusetts, Sterling, in its reply brief for the first time, claims that the unfair behavior involved Lincoln's: "purporting to negotiate under the terms of the IHA" with Sterling in Massachusetts; "violating the IHA despite those negotiations;" sending a letter to Sterling stating that Sterling lacked standing to assert any claim under the IHA; and failure to inform Sterling that it had expanded the number of out-of-state tracks on which it would accept wagers. The Court finds that these feeble allegations fail to inject life into the claim. The actions implicated, even in the light most favorable to Sterling, either did not occur in Massachusetts or could not have caused any loss Sterling alleges to have suffered as a result of Lincoln's conduct, as required by Chapter 93A. *Massachusetts Farm Bureau Fed'n. v. Blue Cross of Mass.*, 403 Mass. 722, 730, 532 N.E.2d 660, 665 (1989). Thus, Sterling has failed to demonstrate a likelihood of success on its Chapter 93A claim in the complaint.

In sum, the Court finds that Sterling has failed to establish a likelihood of success on any of its claims. As likelihood of success is "critical" in the preliminary injunction determination, *Narragansett Indian Tribe*, 934 F.2d at 6; *Kleczek*, 768 F.Supp. at 953, the Court finds it unnecessary to explicitly consider the remaining preliminary injunction factors. Thus, the foregoing reasoning suffices as a basis for denying plaintiff's motion for preliminary injunction.

## II. SUMMARY JUDGMENT

Turning to Lincoln's motion, the standard for ruling on a summary judgment motion is set forth in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Further, the court must view the facts and all inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co.*, 924 F.2d at 373.

Applying the standard here establishes that the two federal question claims are ripe for summary judgment. As detailed above, there are no genuine issues of material fact, even viewing the record in the light most favorable to Sterling. The issues in question are ones of law, not fact. Following the reasoning advanced for the preliminary injunction analysis, the Court has determined that Lincoln is entitled to a judgment as a matter of law on both of these claims. First, Sterling, as a 60-mile track, has no standing under the IHA. Second, Lincoln's acceptance of interstate wagers, even accepting Sterling's version of the facts, does not amount to "racketeering activity" under RICO, and Sterling could secure no relief under the statute.

Dismissing the two federal claims leaves only the Massachusetts Consumer Protection Act claim. As plaintiff has not alleged the existence of diversity jurisdiction, the Court must determine whether to exercise its pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). "The Supreme Court has pointed out: '[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Newman v. Burgin*, 930 F.2d 955, 964 (1st Cir.1991) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988)). Accordingly, in light of the interests of judicial economy, convenience, fairness, and comity in this instance, the Court declines to exercise jurisdiction over the Massachusetts claim.

## CONCLUSION

Consistent with the foregoing reasoning, the Court denies Sterling's motion for pre-

liminary injunction, grants Lincoln's motion for summary judgment on the two federal claims against it, and declines to exercise jurisdiction over the state law claim. The Clerk will enter judgment for the defendant forthwith.

It is so Ordered.