March 26, 1993

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2260

STERLING SUFFOLK RACECOURSE LIMITED PARTNERSHIP,

Plaintiff, Appellant,

v.

BURRILLVILLE RACING ASSOCIATION, INC.,

Defendant, Appellee.

ERRATA SHEET

The opinion of this Court issued March 25, 1993, is amended
as follows:

Remove duplicated "BEFORE" from cover page of opinion.
BEFORE

March 25, 1993 [SYSTEMS NOTE: For version of this opinion with
the appendix included, please contact the Clerk's Office, United
States Court of Appeals for the First Circuit. This version of
the opinion DOES NOT contain the appendix.]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2260

STERLING SUFFOLK RACECOURSE LIMITED PARTNERSHIP,

Plaintiff, Appellant,

v.

BURRILLVILLE RACING ASSOCIATION, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Selya, Cyr and Stahl, Circuit Judges.

E. Randolph Tucker, with whom Michael D. Ricciuti, David B.

Crevier, Joshua M. Davis, and Hill & Barlow were on brief, for

appellant.
Kent E. Mast, with whom Peter J. McGinn, Tillinghast Collins

& Graham, and Kilpatrick & Cody were on brief, for appellee.

SELYA, Circuit Judge. In this appeal, we confront two
SELYA, Circuit Judge.

issues of novel impression at the appellate level. First, we

must determine whether the Interstate Horseracing Act (IHA), 15

U.S.C. 3001-3007 (1988), the full text of which is set out in

the appendix, contains an implied private right of action in

favor of racetracks situated within sixty miles of a display

track, i.e., a track that accepts interstate off-track wagers on

races to be run at distant tracks and then simulcasts the actual

races. Second, we must determine whether certain alleged

violations of the IHA comprise a pattern of racketeering activity

falling within the ambit of the Racketeer Influenced and Corrupt

Organizations Act (RICO), 18 U.S.C. 1961-1968 (1988 & Supp.

III 1991). Believing, as we do, that the court below correctly

answered both inquiries in the negative, we affirm.

I. AT THE STARTING GATE

The relevant facts are not in dispute. Plaintiff-

appellant Sterling Suffolk Racecourse Limited Partnership

(Suffolk) conducts live horseracing at Suffolk Downs, a track in

the metropolitan Boston area. Approximately fifty miles away, in

Lincoln, Rhode Island, defendant-appellee Burrillville Racing

Association, Inc. (Lincoln) operates a greyhound track (Lincoln

Greyhound Park) and an off-track betting (OTB) office, see 15

U.S.C. 3002(8), for, inter alia, accepting interstate off-track

wagers, see 15 U.S.C. 3002(3). This means, in short, that

Lincoln accepts bets on horseraces to be run at distant tracks

and, employing telephone and wire linkages, effectively places

3

these wagers in the host track's parimutuel pool. When a race is

run, closed circuit television transmission enables Lincoln's

patrons to witness it. Lincoln then settles with the bettors,

pays a percentage to the host track, and retains the balance.

While this form of wagering is legal under the relevant

laws of all states involved here, 15 U.S.C. 3004(a) prohibits

such wagering at OTB offices unless three parties consent: (1)

the track which conducts the live race; (2) the racing commission

having jurisdiction to regulate racing within the state where the

live race occurs; and (3) the racing commission having

jurisdiction over race wagering in the state where the simulcast

occurs.1 The host racing association, in turn, must obtain the

consent of the trade association representing the owners of

horses running in the live race before signalling its

acquiescence.2 See id. Lincoln procures the consent of these

parties for every race on which it accepts wagers.

A separate subsection of the IHA also requires OTB

offices to obtain the approval of "all currently operating tracks

within 60 miles" or, if there are no such tracks, "the closest

currently operating track in an adjoining State," 15 U.S.C.

3004(b)(1), before accepting interstate off-track wagers. It is

1In the parlance of the IHA, these three entities are called
the "host racing association," "host racing commission," and
"off-track racing commission," respectively. See 15 U.S.C.

3002(9)-(11). We refer the reader to the statutory appendix for
more precise definitions of each term.

2The trade association is called the "horsemen's group."
See 15 U.S.C. 3002(12).

4

no secret that Lincoln regularly violates this provision by

accepting wagers against Suffolk's wishes.3

Disgruntled at being shut out in this fashion, Suffolk

sued Lincoln in the United States District Court for the District

of Rhode Island. It sought to curtail Lincoln's practice of

accepting wagers on races run at out-of-state tracks. Suffolk

advanced two theories, asseverating that Lincoln's activities

transgressed the IHA and also constituted a pattern of indictable

activity under federal gambling laws, see, e.g., 18 U.S.C.

1084(a) (1988), and, therefore, justified injunctive relief under

RICO. See 18 U.S.C. 1961(1), 1962(a). The district court

rejected this two-pronged assault. It held that Suffolk lacked

standing to assert a claim under the IHA and that Lincoln's

acceptance of interstate off-track wagers without Suffolk's

blessing was not the stuff from which a RICO suit could be

fashioned. See Sterling Suffolk Racecourse Ltd. Partnership v.

Burrillville Racing Ass'n, Inc., 802 F. Supp. 662, 669-71 (D.R.I.

1992). Hence, the district court denied Suffolk's prayer for

injunctive relief and granted Lincoln's motion for summary

judgment. Id. at 673. This appeal ensued.

II. OFF AND RUNNING

We devote our initial explicatory efforts to the

leading question in the case: Does the IHA give so-called "60-

mile tracks," i.e., tracks operating within sixty miles of an OTB

3In December 1991, Lincoln sought Suffolk's approval, but
made no sufficiently spectacular bid. Hence, the parties failed
to reach an accord.

5

office, an implied right of action for injunctive relief?

Because this issue is purely legal, we consider it de novo. See,

e.g., Liberty Mutual Ins. Co. v. Commercial Union Ins. Co., 978

F.2d 750, 757 (1st Cir. 1992).

In determining whether a private cause of action is

implied in a federal statute, a court's central focus must be on

congressional intent. See, e.g., Karahalios v. National Fed'n of

Fed. Employees, 489 U.S. 527, 532-33 (1989) ("Unless . . .

congressional intent can be inferred from the language of the

statute, the statutory structure, or some other source, the

essential predicate for implication of a private remedy simply

does not exist.") (citation and internal quotation marks

omitted); Stowell v. Ives, 976 F.2d 65, 70 n.5 (1st Cir. 1992)

("There is a presumption against implied rights of action a

presumption that will endure unless the plaintiff proffers

adequate evidence of a contrary congressional intent."). To

discern this intent, courts employ the customary tools of

statutory interpretation, see, e.g., Thompson v. Thompson, 484

U.S. 174, 179 (1988); Touche Ross & Co. v. Redington, 442 U.S.

560, 575-76 (1979), frequently asking, however, three questions

which often have special salience in connection with implied

rights of action. These queries are: (1) Is the plaintiff one of

the class for whose especial benefit the legislation was enacted?

(2) Is the remedy sought consistent with the underlying purposes

of the legislative scheme? (3) Is the cause of action one

traditionally relegated to state law? See Thompson, 484 U.S. at

6

179; Cort v. Ash, 422 U.S. 66, 78 (1975); Latinos Unidos de

Chelsea v. Secretary of HUD, 799 F.2d 774, 792 (1st Cir. 1986).4

Here, the district court followed this roadmap

expertly. See Sterling, 802 F. Supp. at 666-69. Its opinion is

astute. Its views are articulated with clarity and precision.

It builds upon other persuasively reasoned caselaw reaching the

identical result. See, e.g., New Suffolk Downs Corp. v.

Rockingham Venture, Inc., 656 F. Supp. 1190, 1194 (D.N.H. 1987).

Under these auspicious circumstances, we see no need to reinvent

the wheel. Rather, we affirm the lower court's holding that the

IHA implies no private right of action in favor of 60-mile tracks

for essentially the reasons elucidated in the opinion below. We

pause, however, to add some observations and clarifications.

First: Although we concur in Judge Lagueux's bottom-
First:

line assessment that the IHA does not give 60-mile tracks a

private right of action, and in his related evaluation of two of

the three Cort factors the remedy that Suffolk seeks seems to

be at odds with the IHA's underlying purposes and the cause of

action questions what activities may lawfully be carried out at a

state-regulated gambling facility, a matter traditionally

4To be sure, the Cort Court also asked a fourth question:

Is there evidence of legislative intent to create or deny a
private right of action? See Cort, 422 U.S. at 78; see also

Latinos Unidos, 799 F.2d at 792. The Justices have since made

clear, however, that the fourth question is really a tote board
for tallying the answers to all the other inquiries and,
therefore, need not be considered separately. See Thompson, 484

U.S. at 179; California v. Sierra Club, 451 U.S. 287, 293 (1981);

see also Royal Business Group, Inc. v. Realist, Inc., 933 F.2d

1056, 1060 (1st Cir. 1991).

7

relegated to state law we think it is advisable to begin by

remarking a point of disagreement. Unlike Judge Lagueux, 802 F.

Supp. at 667, we believe Congress, even though it did not choose

to confer a private right of action, see infra, nevertheless

designed section 3004(b)(1)(A) for the benefit of 60-mile tracks.

See Cort, 422 U.S. at 78; see also Royal Business Group, Inc. v.

Realist, Inc., 933 F.2d 1056, 1061-62 (1st Cir. 1991) (discussing

"especial benefit" test).

The especial benefit inquiry in implied right of action

cases need not be a search for a single class of plaintiffs the

class which the entire statute is most directed toward assisting.

Rather, different parts of a statutory scheme can be aimed at

benefitting different classes of persons. See, e.g., Cohen v.

Massachusetts Bay Transp. Auth., 647 F.2d 209, 212 (1st Cir.

1981) (noting that a particular section of a statute primarily

benefitted consumers while a different section of the same

statute primarily benefitted transit workers); Comtronics, Inc.

v. Puerto Rico Tel. Co., 553 F.2d 701, 705 (1st Cir. 1977)

(discussing a statute that especially benefitted two separate

groups). The inquiry, then, focuses on whether any language in

the statute sufficiently indicates a motivating congressional

purpose to benefit the class in question as opposed to, say, a

mere congressional expression of knowledge anent, or passive

approval of, a tangential benefit. See California v. Sierra

Club, 451 U.S. 287, 294 (1981); Cannon v. University of Chicago,

441 U.S. 677, 690-94 (1979). Properly conducted, this type of

8

investigation weeds out statutes which protect a general public

interest and only incidentally create advantages for particular

people. See, e.g., Cannon, 441 U.S. at 690; Arroyo-Torres v.

Ponce Fed. Bank, 918 F.2d 276, 278 (1st Cir. 1990).

When we shine the light of this understanding on the

IHA, we think that 60-mile tracks meet the "especial benefit"

criterion. Section 3004(b)(1)(A) requires an OTB office to

procure the approval of all 60-mile tracks before accepting

interstate off-track wagers. This requirement, by its own terms,

adequately evinces congressional intent to safeguard the

interests of 60-mile tracks and, therefore, must be viewed as

redounding to their especial benefit. The legislative history

fortifies this conclusion. See, e.g., S. Rep. No. 1117, 95th

Cong., 2d Sess. 4-5 (1978), reprinted in 1978 U.S.C.C.A.N. 4144,

4147-48. No more is exigible. See Cannon, 441 U.S. at 690-94

(finding especial benefit conferred by language more general than

that contained in the IHA).

Still, we hasten to add that this fact alone does not

strike the gold. In this case, the especial benefit element is

at most a dim counterpoint to the bold-faced evidence of

congressional intent intricately interwoven into the IHA's

language and structure. Therefore, the district court's

miscalculation constitutes harmless error.

Second: We turn now to the other indicators of
Second:

legislative intent. It is a familiar precept that, in cases of

statutory interpretation, the language of the statute enjoys

9

preeminence. See Northwest Airlines, Inc. v. Transport Workers,

451 U.S. 77, 91 (1981); Transamerica Mortgage Advisors, Inc. v.

Lewis, 444 U.S. 11, 15-16; Touche Ross, 442 U.S. at 568. Here,

notwithstanding the especial benefit point, the words of the

statute speak strongly against implying a private right of

action. We explain briefly.

When a statute expressly provides remedies, courts must

be extremely reluctant to expand its sweep by augmenting the list

of prescribed anodynes. To the exact contrary, a court

confronted with such a situation should ordinarily conclude that

the legislature provided precisely the redress it considered

appropriate. See, e.g., Karahalios, 489 U.S. at 533 (collecting

cases); Middlesex County Sewerage Auth. v. Sea Clammers, 453 U.S.

1, 14-15 (1981); Nashoba Communications, Ltd. v. Town of Danvers,

893 F.2d 435, 440 (1st Cir. 1990). This is such a case. The IHA

explicitly identifies the parties entitled to bring actions for

damages or injunctions, see 15 U.S.C. 3006 and 60-mile tracks

are not among them. When discussing the potential liability of

violators and outlining the damages they must pay, the IHA

identifies as potential recipients of damage awards only these

same parties. See 15 U.S.C. 3005. And, moreover, the statute

employs a damage calculation formula, see id., that is totally

irrelevant to entities like 60-mile tracks. It strains credulity

to argue that these serial omissions are serendipitous.

The IHA's venue and jurisdictional provisions point in

the same direction. The statute provides that venue is

10

appropriate only in a district in which either the host track or

the display track is located. See 15 U.S.C. 3007(b). It

further provides that jurisdiction is appropriate only in the

courts of the host state or the off-track state.5 See 15 U.S.C.

3007(c). In particular contexts, a statute's silence can be

informative. So it is here: the absence of any provision for

venue or jurisdiction based on the location of an aggrieved 60-

mile track tells a tale.

In sum, given the language of the statute what the

IHA says and what it shies away from saying there is no sure

footing for the implication of a private right of action favoring

non-consenting 60-mile tracks.

Third: The structure of a statute can also be of
Third:

inestimable value in its interpretation. See Crandon v. United

States, 110 S. Ct. 997, 1001 (1990); Greenwood Trust Co. v.

Massachusetts, 971 F.2d 818, 824 (1st Cir. 1992), cert. denied,

113 S. Ct. 974 (1993). In this instance, the statute's structure

seems highly significant. The provision requiring OTB offices to

secure the approbation of the horsemen's group, host racing

association, host racing commission, and off-track racing

commission is set conspicuously apart from the provision

requiring display tracks to seek the approval of 60-mile tracks.

Compare 15 U.S.C. 3004(a) with 15 U.S.C. 3004(b).

The language of the statutory provisions bolsters the

5The "off-track State" is the state in which the "interstate
off-track wager is accepted." 15 U.S.C. 3002(6).

11

conclusion that these structural differences are pregnant with

meaning. Congress phrased the former provision as an absolute

condition precedent to off-track wagering across state lines, see

15 U.S.C. 3004(a) (an "interstate off-track wager may be

accepted by an off-track betting system only if consent is

obtained from [four entities]") (emphasis supplied), but phrased

the latter provision merely as a directive to a private party.

See 15 U.S.C. 3004(b)(1) ("any off-track betting office shall

obtain the approval of [tracks within a 60-mile radius]"). As

the Court has indicated, a statutory provision phrased as a

command to specific people, like the one upon which Suffolk rests

its hopes, is unlikely to breed an implied private right of

action because such language usually evinces a congressional

concern with instructing the putative violator rather than with

providing a remedy to the putative victim. See, e.g.,

Universities Research Ass'n v. Coutu, 450 U.S. 754, 772-73 & n.23

(1981); Cannon, 441 U.S. at 690-93.

Fourth: In this case, the whole is certainly no less
Fourth:

than the sum of its constituent parts. The language of almost

every section of the IHA, and the structure of the pivotal

provisions, strongly suggest that Congress did not intend to

provide disapproving 60-mile tracks with a private right of

action against display tracks. Having discerned so striking an

indication of congressional intent, deeply rooted in the text of

the statute itself, we find Suffolk's reliance on fragmentary

excerpts from the legislative history to be little more than

12

grains of desert sand in the teeth of a haboob. Even clear

legislative history and the history here is less than pellucid

must yield to a contrary implication easily derivable from a

statute's text. See Puerto Rico Dep't of Consumer Affairs v.

Isla Petroleum Corp., 485 U.S. 495, 501 (1988); see also 2A

Norman J. Singer, Sutherland Statutory Construction 46.04,

46.07 (5th ed. 1992) (concluding that courts, when construing

statutes, must adhere primarily to language and structure).

Fifth: We reject appellant's plea that denying an
Fifth:

implied right of action will render nugatory the statutory

provisions dealing with 60-mile tracks. Appellant's reliance

upon a finding of especial benefit, see supra pp. 6-8, to prove

this point is misplaced. That Congress purposely sought to

confer a benefit on entities like Suffolk does not imply that

such was the only or even the overriding motive for enacting

the statute. See, e.g., Cort, 422 U.S. at 81-82 & n.13; Cohen,

647 F.2d at 212. Nor does Congress's intent to benefit 60-mile

tracks inevitably imply that Congress deemed a private right of

action to be a necessary or advisable means of accomplishing its

goal. See Coutu, 450 U.S. at 771 (explaining that "[t]he fact

that an enactment is designed to benefit a particular class does

not end the inquiry; instead it must also be asked whether the

language of the statute indicates that Congress intended that it

be enforced through private litigation"); accord Daily Income

Fund, Inc. v. Fox, 464 U.S. 523, 540-41 (1984); Transamerica, 444

U.S. at 24.

13

By making manifest that OTB offices operating without

the approval of 60-mile tracks are flouting federal law, Congress

supplied other parties with a potential defense should they

cancel contracts with the offending facility or withhold consent

to interstate off-track wagering at such a facility. Cf., e.g.,

Alabama Sportservice, Inc. v. National Horsemen's Benevolent &

Protective Ass'n, Inc., 767 F. Supp. 1573, 1579-80 (M.D. Fla.

1991) (suggesting that withholding of consent on reasonable

grounds would not be an actionable restraint of trade).

Moreover, creating the framework for assertion of such a defense

benefits the 60-mile tracks by furnishing an incentive for

display tracks to comply with the requirement.6 See generally

Daily Income Fund, 464 U.S. at 535, 541 & n.11 (explaining that

the statutory objective to benefit a class may be served by

giving other parties the right to sue). Similarly, display

tracks and 60-mile tracks are frequently located in the same

state and, therefore, subject to the same regulatory authority.

Where that occurs, the IHA has the effect of permitting the

racing commission either to insist on pre-approval or to work out

some other satisfactory solution. Even when a 60-mile track does

not have this home field advantage, the off-track racing

commission may well be persuaded to take regulatory action

against a display track which, like Lincoln, scorns a federal

6Lincoln itself has been hoist on this petard. Several
organizations withdrew consent because of Lincoln's failure to
obtain Suffolk's approval, thereby depriving Lincoln of the right
to accept wagers on races originating at the non-consenting
tracks.

14

mandate. Cf., e.g., CBS Inc. v. FCC, 453 U.S. 367, 373-75

(1981); FCC v. Pacifica Foundation, 438 U.S. 726, 730-31 (1978).

In sum, our holding that no private right of action

exists does not sanction blatant disregard of federal law or

render the approval requirement without worth to the 60-mile

tracks. It merely ensures that negotiations for a green light

from market-area tracks will occur in the context Congress

envisioned, with neither party completely beholden to the other.

After all, were we to infer a right of action along the lines

that Suffolk delineates, we would hand 60-mile tracks an

important veto power over the operation of nearby OTB offices

and, in the bargain, tilt the delicate balance Congress so

painstakingly constructed.

We will not belabor the point. In the long run,

Congress may well have thought that the indirect benefits flowing

from a right of approval that had little bite were preferable to

the potential vices involved in granting 60-mile tracks the right

to gnaw at will. See generally Jerry L. Mashaw, Textualism,

Constitutionalism, and the Interpretation of Federal Statutes, 32

Wm. & Mary L. Rev. 827, 842 (1991) (suggesting that implied

private rights of action can eclipse the important role of

agencies in weighing conflicting concerns); Frank H. Easterbrook,

Foreword: The Court and the Economic System, 98 Harv. L. Rev. 4,

45-51 (1984) (warning that courts, in venturing to alter the

particular personality which Congress has chosen to embody in

statutes, may shift the balance of entitlements and sire

15

overdeterrence).

III. THE HOME STRETCH

We turn next, albeit briefly, to the question of

whether appellant, on these facts, framed a cognizable claim

under the RICO statute. Suffolk argues that Lincoln's unapproved

acceptance of wagers constitutes a pattern of indictable activity

under federal gambling laws and, therefore, violates the RICO

statute. The court below did not agree. See Sterling, 802 F.

Supp. at 669-70. We think the lower court reached the right

result: Lincoln's acceptance of wagers on distant races without

Suffolk's consent does not constitute a crime which can carry the

weight of a RICO complaint.7

RICO targets the use, in connection with any enterprise

affecting interstate commerce, of income derived "from a pattern

of racketeering activity." 18 U.S.C. 1962(a). The term

"racketeering activity" is defined in 18 U.S.C. 1961(1).

Included in the definition is any act indictable under 18 U.S.C.

1084, a statute which criminalizes, inter alia, utilization of

a wire facility for the "transmission in interstate . . .

commerce of . . . information assisting in the placing of bets .

. . on any sporting event." 18 U.S.C. 1084(a). Conceding,

withal, that wagering of the sort transacted at Lincoln's

facility is permissible under the relevant laws of all interested

states, appellant pins its RICO-related hopes on section 1084(a).

7Here, again, the issue is purely legal and appellate review
is plenary.

16

But, section 1084(a) carves out a specific exception for

circumstances in which wagering on a sporting event is legal in

both the sending state and the receiving state. See 18 U.S.C.

1084(b). That exception applies here.

Leaving the IHA to one side, appellant has no case.

The legislative history of section 1084 shows beyond peradventure

that Congress enacted section 1084(b) for the express purpose of

allowing off-track betting in venues where states chose to

legalize such activity (thereby reserving to individual states

some measure of control over what forms of gambling could occur

within their borders). See H.R. Rep. No. 967, 87th Cong., 1st

Sess. (1961), reprinted in 1961 U.S.C.C.A.N. 2631, 2632-33.

Thus, given that the operation of Lincoln's OTB office does not

offend relevant state law, we have no non-IHA-related reason to

declare that the actions complained of in this suit constitute

indictable conduct under section 1084.

Appellant tells us that the IHA makes a dispositive

difference. But, we do not understand how this can be true. All

available evidence indicates that Congress intended the IHA to

have purely civil consequences. For instance, the IHA's

enforcement and remedies sections specifically exclude the

possibility of governmental involvement and/or the specter of

criminal penalties. See 15 U.S.C. 3005, 3006. The section

dealing with jurisdiction and venue refers only to "civil

action[s]." 15 U.S.C. 3007. The legislative history teaches

that Congress intended there to "be no Government enforcement" of

17

the IHA; and further intended that "[a]ny person accepting an

interstate wager other than in conformity with the act will

instead be civilly liable in a private action for damages to the

host State, the host racing association, and the applicable

horsemen's group." S. Rep. No. 1117, 1978 U.S.C.C.A.N. at 4146

(emphasis supplied); see also H.R. Rep. No. 1733, 95th Cong., 2d

Sess. 3 (1978) (same). In the face of this imposing array,

Suffolk's argument that the IHA serves as a fulcrum to

criminalize Lincoln's activities must fail.

To recapitulate, we think it clear that Congress, in

adopting section 1084, did not intend to criminalize acts that

neither the affected states nor Congress itself deemed criminal

in nature. Lincoln's acts fall into this chiaroscuro category

perhaps not right, but certainly not felonious. It follows that

these acts, not indictable under section 1084, cannot constitute

a pattern of racketeering activity within RICO's definitional

parameters. Hence, the court below properly granted summary

judgment on the RICO count.8

IV. AT THE WIRE

We need go no further. Simply stated, Congress's

discernible intent precludes us from inferring a private right of

8The district court held, in the alternative, that RICO does
not confer a right to sue for equitable relief on private
plaintiffs and that, therefore, even if Suffolk had raised a
colorable RICO claim, no injunction could issue. See Sterling,

802 F. Supp. at 670-71; see also Lincoln House, Inc. v. Dupre,

903 F.2d 845, 848 (1st Cir. 1990) (expressing doubts about the
availability of such relief). Because we affirm, without caveat,
the district court's primary holding concerning the RICO claim,
we do not address this alternate ground.

18

action in appellant's favor. Because this is so, and because

appellant's complaint likewise fails to limn a cognizable

racketeering claim, the judgment below, to invoke the name of a

very famous racehorse, must be

Affirmed.

19