**ALABAMA SPORTSERVICE, INC., et al., Plaintiffs,**

v.

**NATIONAL HORSEMEN'S BENEVO- LENT & PROTECTIVE ASSOCIA- TION, INC., et al., Defendants.**

**No. 91–155–CIV–T–17A.**

United States District Court, M.D. Florida, Tampa Division.

June 13, 1991.

1574

Kent E. Mast, Kilpatrick & Cody, Atlanta, Ga., James Maxwell Landis, Foley & Lardner, Tampa, Fla., for plaintiffs.

Keith Eugene Rounsaville, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., Dow N. Kirkpatrick, J. Kennard Neal, Alston & Bird, Atlanta, Ga., Bruce David Green, Ft. Lauderdale, Fla., Salvador Anzelmo, New Orleans, La., for defendants.

### ORDER ON MOTION FOR PRELIMINARY INJUNCTION

KOVACHEVICH, District Judge.

This cause is before the Court on the following:

Dkt. 17   Motion for Preliminary Injunction

Dkt. 18   Memorandum in Support of PI

Dkt. 28   Affidavits in Support of PI

Dkt. 29   Supplemental Memorandum in Support of PI

Dkt. 30   Compilation of Affidavits and Exhibits in Support of PI

Dkt. 32   Affidavit in Support of PI

Dkt. 35   Memorandum in Opposition to PI

Dkt. 36   Statement of Facts in Opposition to Motion for PI

Dkt. 37   Affidavits in Opposition to PI

Dkt. 40   Proposed Findings of Fact and Conclusions of Law by Defendants

Dkt. 41   Objections to Plaintiffs' Affidavits

Dkt. 43   Objections to Defendants' Affidavits

Dkt. 46   Notice of Supplemental Authority by Plaintiffs

Dkt. 57   Report and Recommendations of Judge Charles R. Wilson

Dkt. 67   Defendants' Objections to R & R

Dkt. 72   Plaintiffs' Response to Objections

Dkt.   Deposition in Opposition to PI

## I.   Standard for Issuance of Preliminary Injunction

A district court may grant injunctive relief if the movant shows (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) that if issued the injunction would not be adverse to the public interest. "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four prerequisites." *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983) (quoting *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974)).

## II.   Standing

The Court has examined the report and recommendation of Magistrate Charles R. Wilson, and has independently reviewed the applicable pleadings as to this issue. The Court adopts the report and recommendation as to standing. Since Sportservice has standing to bring this action, it was entitled to add Plaintiffs Birmingham Turf Club, Inc. and Birmingham Turf Club, Ltd. by filing its First Amended Complaint. *Delta Coal Program v. Libman,* 743 F.2d 852 (11th Cir.1984).

## III.   Tension between the IHA and the Sherman Act

The applicable provision of the Interstate Horseracing Act of 1978, 15 U.S.C. § 3004, states:

(a) An interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from—

(1) the host racing association, except that—

(A) as a condition precedent to such consent, said racing association (except a not-for-profit racing association in a State where the distribution of off-track betting revenues in that State is set forth by law) must have a written agreement with the horsemen's group, under which said racing association may give such consent, setting forth the terms and conditions relating thereto;  provided

(B) that where the host racing association has a contract with a horsemen's group at the time of enactment of this chapter which contains no provisions referring to interstate off-track betting, the terms and conditions of said then-existing contract shall be deemed to apply interstate off-track wagers and no additional written agreement need be entered into unless the parties to such then-existing contract agree otherwise. Where such provisions exist in such existing contract, such contract shall govern. Where written consents exist at the time of enactment of this chapter between an off-track betting system and the host racing association providing for interstate off-track wagers, or such written consents are executed by the parties prior to the expiration of such then-existing contract, upon the expiration of such then-existing contract the written agree-

ment of such horsemen's group shall thereafter be required as such condition precedent and as a part of the regular contractual process, and may not be withdrawn or varied except in the regular contractual process. Where no such written consent exists, and where such written agreement occurs at a racing association which has a regular contractual process with such horsemen's group, said agreement by the horsemen's group may not be withdrawn or varied except in the regular contractual process;

(2) the host racing commission;

(3) the off-track racing commission.

(b)(1) In addition to the requirement of subsection (a) of this section, any off-track betting office shall obtain the approval of—

(A) all currently operating tracks within 60 miles of such off-track betting office; and

(B) if there are no currently operating tracks within 60 miles then the closest currently operating track in an adjoining State.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, any off-track betting office in a State with at least 250 days of on-track parimutuel horseracing a year, may accept interstate off-track wagers for a total of 60 racing days and 25 special events a year without the approval required by paragraph (1), if with respect to such 60 racing days, there is no racing of the same type at the same time of day being conducted with the off-track betting State within 60 miles of the off-track betting office accepting the wager, or such racing programs cannot be completed. Excluded from such 60 days and from the consent required by subsection (b)(1) of this section may be dark days which occur during a regularly scheduled race meeting in said off-track betting State. In order to accept any interstate off-track wager under the terms of the preceding sentence the off-track betting office shall make identical offers to any racing association described in subparagraph (A) of subsection (b)(1) of this section. Nothing in this subparagraph shall be construed to re-duce or eliminate the necessity of obtaining all approvals required by subsection (a) of this section.

The following terms are defined in 15 U.S.C. § 3002:

"Host racing association" means any person who, pursuant to a license or other permission granted by the host State, conducts the horserace subject to the interstate wager;

"Horsemen's group" means, with reference to the applicable host racing association, the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day;

"Host racing commission" means that person designated by State statute, or in the absence of statute, by regulation, with jurisdiction to regulate the conduct of racing within the host State;

"Off-track racing commission" means that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State;

"Terms and conditions" includes, but is not limited to, the percentage which is paid by the off-track betting system to the host racing association, the percentage which is paid by the host racing association to the horsemen's group, as well as any arrangements as to the exclusivity between the host racing association and the off-track betting system.

The legislative history of the Interstate Racing Act of 1978 aids the Court in interpreting the Act:

The bill provides that interstate off-track wagers may only be accepted with the consent of certain parties with an interest in the applicable horserace: the racetrack where the race is run and the racing commissions of the two States involved. The bill provides that consent cannot be given by the host track in disregard of the interests of its horsemen and horsewomen, and requires that the host track obtain a written agreement as to terms and conditions with the

applicable horsemen's group as a condition precedent to its consent....

The bill provides for this condition precedent to be exercised in a particular manner, depending upon the existence of a contract and its terms between the track and its horsemen and horsewomen. It is intended that under certain circumstances specified in the act, such consent by the horsemen's group will be an issue to be considered as part of the regular contractual process, concurrent with other issues concerning the conduct of racing at that track, and not as an isolated issue.

The bill further recognizes that a limited amount of interstate off-track wagering, if utilized by a legal off-track betting system pursuant to these consents to continue or augment its operations, is necessary for the legal off-track betting industry, and has no adverse effect on the racing industry....

With this provision [ ] the bill provides racetracks with the means of protecting their natural market areas by imposing an additional market area consent....

The bill recognizes that certain special racing events of national interest warrant the taking of interstate wagers. Interstate wagering on such events increases the events' market area, and benefits racing as a whole by increasing national interest in the sport. The bill therefore provides that interstate wagers on twenty-five such events per year may be accepted without the market area consents discussed in the preceding paragraphs....

## BACKGROUND AND NEED FOR THE LEGISLATION

In the United States, parimutuel horseracing is a significant industry which provides substantial revenue to the States through direct taxation of gross wagers and through a number of additional taxes, provides employment opportunities for thousands of individuals and contributes favorably to the balance of trade.

Legal off-track wagering on horseraces is a relatively new industry in the United States which already provides additional employment opportunities for thousands of individuals, provides substantial revenue to the States and to local and municipal governments, and has demonstrated both actual and potential benefits to the racing industry. At the same time, however, unregulated interstate off-track wagering may act to the detriment of the states and the horseracing industry if there is not cooperation among the States in its implementation and growth.

Unregulated interstate off-track parimutuel wagering could result in a decline in attendance and wagering at racetracks throughout the country which, in turn, would result in loss of revenue to the States and the racing industry. This could force the closing of a number of small racetracks and that could, in turn, seriously harm the racing industry and the States which derive revenue from those tracks.

At the same time it is recognized that properly regulated and properly conducted interstate off-track betting may contribute substantial benefits to the States and the horseracing industry. These benefits would result from expanded market areas that would enable an increased number of fans to participate in racing, from additional media coverage of racing because of those expanded market areas and because of additional interest in racing engendered by the aforementioned two benefits, and from additional employment opportunities and additional revenues to States and the racing industry.

The reported bill is designed to ensure a continued flow of revenue from parimutuel wagering, to protect and further the horseracing and legal off-track betting industries in the United States, and to ensure the cooperation of the States in the regulation and acceptance of legal interstate wagers. The bill recognizes that the racing industry depends upon parimutuel betting. A percentage of the wagers placed at legal off-track betting offices and at racetracks is withdrawn from the parimutuel pool to defray operating expenses, pay State taxes which

amount to more than $700 million in direct revenue each year and for purses for horse owners. These revenues could be adversely affected by unregulated interstate off-track parimutuel wagering. The bill ensures that the racing industry is protected from unregulated interstate off-track betting. . . .

The smaller circuit tracks are the "minor leagues" of the racing industry. Minor racing circuits are the backbone of the racing and breeding industry and over 75 percent of the nation's tracks fall within this category. These small tracks play an important role with respect to the development opportunities for both jockeys and horses. Small racetracks can survive only because major race tracks are not located in competing geographical locations. Consequently, racing fans patronize local tracks. Furthermore, not all horses are of the quality to compete at the few major national tracks. Thus, small tracks provide a necessary marketplace and give horse owners an opportunity to receive a return on their investment . . .

The legislative history further provides:

This legislation in no way modifies or affects the scope or application of the antitrust laws of the United States, nor does it confer upon any person or persons the right to enter into any agreement in restraint of trade which would be prohibited under the antitrust laws.

H.R.Rep. No. 1733, 95th Cong., 2d Sess., at 4 (1978) U.S.Code Cong. & Admin.News 1978, pp. 4132.

The applicable provision of the Sherman Act, 15 U.S.C. § 1, states:

Every contract in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

In January, 1991, at the annual convention of the National Horsemen's Association, which is composed of the State horsemen's associations and individual owners and trainers, a resolution was adopted. The resolution states:

Except as otherwise provided in a presently existing contract to the end of its term, or in any provision of the Interstate Horseracing Act of 1978, the National HBPA urges and requests that each of its divisions withhold the consent required by the provisions of 15 U.S.C. § 3001(3)(12) [sic]—15 U.S.C. § 3004(a)(1)(A)—to racing associations for interstate simulcasts for interstate wagering to an off-track betting system, authorized by law, which is in the business of accepting wagers on horseraces at other locations other than the place where the horserace is run where (1) live racing once authorized has ceased to be conducted or (2) live racing is authorized but the HBPA's 1990 simulcast policy cannot be implemented and enforced by an HBPA Division.

Prior to the adoption of the resolution the California Horsemen's and Florida Horsemen's withheld the consents required under the IHA. Defendants contend that this resolution is advisory in nature and that each individual horsemen's group makes a unilateral decision to adopt and implement it each time consent is sought to permit simulcasting.

In Count I of the Amended Complaint, Plaintiffs allege that the National Horsemen's Association, the Florida Horsemen's Association, the California Horsemen's Association, as well as individual officers and directors of those associations, conspired to unreasonably restrain trade by agreeing that members of the NHBPA would adopt a policy of withholding consent from any track no longer conducting live racing, unless the track is located in an area where the said policy cannot be enforced by a member association of the NHA.

## IV. Question of Law and Factual Dispute

Magistrate Wilson determined that the motion for preliminary injunction presented questions of law and therefore did not conduct an evidentiary hearing prior to the issuance of the Report and Recommendation. Defendants contend that the presence of factual disputes mandates an evidentiary hearing.

## V. Discussion

### A. *Likelihood of Success on the Merits*

1. Conspiracy between Officers/Directors and State Horsemen's Groups

In reliance on *Bolt v. Halifax Hospital Medical Center*, 891 F.2d 810 (11th Cir. 1990), Magistrate Wilson found that the Directors of Florida Horsemen's conspired with each other and with Florida Horsemen's to withhold consent to proposed simulcasting to BRC. Magistrate Wilson also found that the Officers and Directors of California Horsemen's conspired with each other and with California Horsemen's to withhold consent. Magistrate Wilson further found that National Horsemen's conspired with Florida Horsemen's to withhold consent. Magistrate Wilson also found that National Horsemen's creation of a Director of Simulcasting position represented a concerted effort to diminish or eliminate competition.

■■■ A claim of conspiracy in restraint of trade under the Sherman Act requires that the Court determine whether some form of joint action exists to satisfy the "contracts, combinations, or conspiracy" requirement. It is only after concerted action is found that a court need proceed to the second part of the analysis—whether the concerted activity is an unreasonable restraint of trade. *Kreuzer v. American Academy of Periodontology, et al.*, 735 F.2d 1479 (D.C.Cir.1984) The standard for conspiracy requires ... something more than parallel behavior. Moreover, it is not enough to prove that the alleged co-conspirators merely exchanged information. *Kreuzer, supra*, at 1487 (quoting *Maple Flooring Manufacturers Association v. United States*, 268 U.S. 563, 45 S.Ct. 578, 586, 69 L.Ed. 1093 (1925). Liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect. *United States Gypsum Co.*, 438 U.S. 422, 436, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978).

The Court must determine whether the record is sufficient to establish actual or implied agreement to withhold consent by the National Horsemen's, the State Horse-men's groups, and their Officers and/or Directors to eliminate the threat simulcasting may pose to the continuing existence of smaller race tracks.

Plaintiffs have offered circumstantial evidence to prove the existence of the various conspiracies between and among Officers and Directors and their State associations. Defendants contend that they have withheld consent for a lawful purpose pursuant to the Interstate Horseracing Act of 1978.

■■ The Interstate Horseracing Act of 1978 provides that the consent of the horsemen's group may be withdrawn or varied only within the regular contractual process of negotiating an agreement as to terms and conditions between the horsemen's group and the host racing association. The contractual process is not one that can be regulated. The freedom to negotiate expressly contemplated by the IHA does not necessarily result in antitrust injury to the simulcast industry when consent is withheld. The difficulty for the Court is that what boycott participants do is not necessarily different from what they would do in the absence of an impermissible boycott. This requires the Court to exercise extreme caution in it evaluation.

While the horsemen's groups are composed of competitors within the horseracing industry, the contractual process contemplates that the members of a group come to an agreement on the issue of consent. It is the legislative intent of the IHA that host racing associations and/or horsemen's groups give consent in exchange for acceptable "terms and conditions"—agreements as to money and exclusivity. Consent is not to be negotiated as a separate issue but concurrently with those issues.

At this time it is unclear for what additional conditions the IHA permits consent to be negotiated. The Court must consider whether the reference to "terms and conditions" may include the requirement of live racing. It is unclear whether the requirement of live racing is merely a pretext. It is unclear who has the power to compel the parties to continue to negotiate. If consent is unreasonably withheld, that dispute

would have to be determined on a case-by-case basis, and either the IHA or well established principles of contract law would control.

Plaintiffs contend that the State groups and their Officers and Directors withheld consent with the intent of eliminating the simulcasting industry. Once impermissible intent has been shown, Defendants must establish that the group behavior is designed to serve economic efficiency, to advance the group's general economic self-interest without being intended to affect adversely any other group's profits, or to advance the group's social and moral objectives. *Kreuzer v. American Academy of Periodontology*, 735 F.2d 1479, 1493 (D.C.Cir.1984). However, intent is not determinative. The Court must look beyond intent to the effects of a boycott. Whatever the group's intent (and no matter how genuinely held), a boycott, if successful, may nonetheless injure the victim of the boycott and often thereby injure competition. *Kreuzer* at 1493.

A group boycott rarely exists in a vacuum; it is usually the means of enforcing compliance with a larger anti-competitive scheme. H. Hovenkamp, *Economics and Federal Antitrust Law*, 275–276. A combination among boycotting suppliers is not necessary to this cause of action. Ordinarily, all participants in a group boycott will enforce the arrangement together. But a boycott exists even if each supplier, without considering the others, agrees to the demands of the target's competitors to cut off the target. Numerosity of suppliers is needed only to establish that the agreements, taken together, diminish competition sufficiently to be deemed illegal. *See* L. Sullivan, *Handbook of the Law of Antitrust*, 260 (1977).

The Court bears in mind that effect of a restraint of trade must be gauged according to its effect on *competition*, not *competitors*. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original). The Court finds no error in the determination that trade associations are comprised of competitors. However, at this point the Court can determine neither the intent nor the impact of the withholding of consent by any one state for any one race on the horseracing industry as a whole.

As to intent, the Court finds that an evidentiary hearing is necessary for face-to-face evaluation of the supporting affidavits. As to effect, some states have more market power than others. To withhold consent inevitably means that competition will be diminished, but the question is whether it is diminished sufficiently to be deemed illegal. The Court must deny the motion for preliminary injunction as to the State groups and their Officers and Directors until an evidentiary hearing is conducted.

2. Conspiracy between NHBPA, Horsemen's Groups and Others

Magistrate Wilson found the existence of a conspiracy between NHBPA and Florida Horsemen's. The report and recommendation of Magistrate Wilson does not address the presence of a conspiracy between the NHBPA and its members, various individual owners/trainers and other various State horsemen's groups, or the presence of any conspiracy among the State groups. The Court finds that the record is not sufficient to establish the presence of conspiracy between the NHBPA and the Florida Horsemen's. There are open issues which the Court looks forward to resolving on a motion for summary judgment.

In issuing the order granting a temporary restraining order, the Court found that there was a substantial likelihood of success on the merits as to a conspiracy to unreasonably restrain trade in the form of a group boycott. In a conventional boycott, actors at one level seek to protect themselves from competition from non-group members who do business or wish to do business at their level by taking concerted action aimed at depriving the excluded competitors of some necessary trade relationship. *See* Sullivan, *Handbook of the Law of Antitrust*, 230 (1977). Typically, they combine to induce one or more suppli-

ers, who value the conspirators patronage, to cut off the target. The act is deemed *per se* violative of the Sherman Act. *See Fashion Originators Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

■ Defendants argue that no explicit agreement is shown, and that each State group claims it acts independently. However, the pattern of behavior charged may amount to a group boycott under a theory of coerced acquiescence. The Court notes the following, from Professor Sullivan:

> In some situations the boycotting group does not coerce any supplier or customer not to deal with non-group members by threatening themselves to withhold patronage. Rather, they succeed without such a threat in inducing one or more suppliers or customers to stop dealing with the boycott victim or victims. This might be done in some wrongful way, such as by using fraudulent records to convince a supplier that a non-group member is a bad credit risk. Or it might be done simply by urging the customer or supplier to take the desired course, by saying for example that group members would appreciate it. It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement, is in purpose and effect a boycott.

L. Sullivan, *Handbook of the Law of Antitrust*, 230–1 (1977).

■ The Court notes that, due to the advisory nature of the resolution, its adoption by the NHBPA and its members does not establish the presence of an express agreement. It does present circumstantial evidence from which the Court may infer a tacit agreement. The test is whether the circumstances under which parallel behavior occurs make inference of rational independent choice less attractive than that of concerted action. *Bogosian v. Gulf Oil Corp., et al.*, 561 F.2d 434, 446 (3rd Cir. 1977).

Plaintiffs must show that Defendants acted in contradiction of their own economic interests, and must demonstrate motivation to enter a concerted refusal to deal. *Venzie Corp. v. United States Mineral Products*, 521 F.2d 1309 (3rd Cir.1975). The Court notes that evidence has been brought forth which establishes that it is not in the economic interest of the horsemen's groups to refuse to allow simulcasting, since it results in a short term loss of revenue to the horsemen's groups as well as to the simulcasters. As to Plaintiffs, continuing short term losses means that inevitably there will be no long term. The view of the horsemen's groups is that no long term existence for the simulcasters is in their economic best interest.

Defendants have produced a number of affidavits designed to establish that the alleged conspirators acted independently. However, evaluation of the affidavits must include a face-to-face credibility determination. An evidentiary hearing is required to make that determination.

The Court must also determine whether the evidence tends to exclude conduct consistent with permissible competition. This involves determining whether the evidence establishes a conscious commitment to a common scheme designed to achieve the unlawful objective of eliminating simulcasting from the horseracing industry. Plaintiff must identify acts that prove a conspiracy because they would not have been taken unless one existed. This means that all other reasons for the decision to refuse to simulcasting, aside from the conspiratorial inference, must be excluded. Business meetings may provide the opportunity for the formation of a conspiracy, but more than one isolated instance of refusal to deal must be shown. The establishment of a systematic and otherwise unexplained refusal to deal would support the Court's finding of a group boycott.

This remains an unresolved issue. The Court does not know whether Plaintiffs are pursuing a conspiracy theory only, or a coerced acquiescence theory. The Court examined the record to determine the impact of a refusal to adopt the resolution on

each member of the NHBPA, and it is unclear to the Court what those consequences would be.

The Court notes that some states, including Maryland and New York, are not members of the NHBPA, and no agent of the NHBPA could enforce the resolution as to those states. This suggests that even if all members of the NHBPA agreed to withhold consent, a source of simulcasting would remain. Since the record is unclear as to the market power of these states in relation to the market power of the states who are members of the NHBPA, the Court is not persuaded that this fact rules out the possibility of an antitrust violation. A practice short of complete monopoly but which tends to create a monopoly and to deprive the public of the advantages from free competition in interstate trade offends the policy of the Sherman Act. *Fashion Originators' Guild of America, Inc. v. Federal Trade Commission,* 312 U.S. 457, 466, 61 S.Ct. 703, 707, 85 L.Ed. 949 (1941).

Based on the foregoing, the Court must deny the motion for preliminary injunction until a further evidentiary hearing is conducted.

B. *Irreparable Injury*

C. *Harm to Defendants and Harm to Plaintiffs*

D. *Public Interest*

In light of its prior discussion, the Court finds it unnecessary to address these elements. The Court does note that financial projections based on sets of assumptions do not quantify damages in this case.

The Court regrets the delay in its entry of this order. This case was somewhat unusual and required additional research and analysis. Accordingly, it is

ORDERED that the motion for preliminary injunction is denied without prejudice, and this matter is referred to the Honorable Charles R. Wilson, United States Magistrate, to conduct an evidentiary hearing.

DONE and ORDERED.