**STERLING SUFFOLK RACECOURSE LIMITED PARTNERSHIP,**
Plaintiff, Appellant,

v.

**BURRILLVILLE RACING ASSOCIATION, INC.,**
Defendant, Appellee.

No. 92–2260.

United States Court of Appeals,
First Circuit.

Heard Feb. 4, 1993.

Decided March 25, 1993.

racetracks situated within sixty miles of a display track, *i.e.*, a track that accepts interstate off-track wagers on races to be run at distant tracks and then simulcasts the actual races. Second, we must determine whether certain alleged violations of the IHA comprise a pattern of racketeering activity falling within the ambit of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1988 & Supp. III 1991). Believing, as we do, that the court below correctly answered both inquiries in the negative, we affirm.

## I. AT THE STARTING GATE

The relevant facts are not in dispute. Plaintiff-appellant Sterling Suffolk Racecourse Limited Partnership (Suffolk) conducts live horseracing at Suffolk Downs, a track in the metropolitan Boston area. Approximately fifty miles away, in Lincoln, Rhode Island, defendant-appellee Burrillville Racing Association, Inc. (Lincoln) operates a greyhound track (Lincoln Greyhound Park) and an off-track betting (OTB) office, *see* 15 U.S.C. § 3002(8), for, *inter alia*, accepting interstate off-track wagers, *see* 15 U.S.C. § 3002(3). This means, in short, that Lincoln accepts bets on horseraces to be run at distant tracks and, employing telephone and wire linkages, effectively places these wagers in the host track's parimutuel pool. When a race is run, closed circuit television transmission enables Lincoln's patrons to witness it. Lincoln then settles with the bettors, pays a percentage to the host track, and retains the balance.

While this form of wagering is legal under the relevant laws of all states involved here, 15 U.S.C. § 3004(a) prohibits such wagering at OTB offices unless three parties consent: (1) the track which conducts the live race; (2) the racing commission having jurisdiction to regulate racing within the state where the live race occurs; and (3) the racing commission having jurisdiction over race wagering in the state where the simulcast occurs.[1] The host racing as-

E. Randolph Tucker, with whom Michael D. Ricciuti, David B. Crevier, Joshua M. Davis, and Hill & Barlow were on brief, for plaintiff, appellant.

Kent E. Mast, with whom Peter J. McGinn, Tillinghast Collins & Graham, and Kilpatrick & Cody were on brief, for defendant, appellee.

Before SELYA, CYR and STAHL, Circuit Judges.

SELYA, Circuit Judge.

In this appeal, we confront two issues of novel impression at the appellate level. First, we must determine whether the Interstate Horseracing Act (IHA), 15 U.S.C. §§ 3001–3007 (1988), the full text of which is set out in the appendix, contains an implied private right of action in favor of

---

1. In the parlance of the IHA, these three entities are called the "host racing association," "host racing commission," and "off-track racing com-mission," respectively. *See* 15 U.S.C. § 3002(9)–(11). We refer the reader to the statutory ap-

sociation, in turn, must obtain the consent of the trade association representing the owners of horses running in the live race before signalling its acquiescence.[2] *See id.* Lincoln procures the consent of these parties for every race on which it accepts wagers.

A separate subsection of the IHA also requires OTB offices to obtain the approval of "all currently operating tracks within 60 miles" or, if there are no such tracks, "the closest currently operating track in an adjoining State," 15 U.S.C. § 3004(b)(1), before accepting interstate off-track wagers. It is no secret that Lincoln regularly violates this provision by accepting wagers against Suffolk's wishes.[3]

Disgruntled at being shut out in this fashion, Suffolk sued Lincoln in the United States District Court for the District of Rhode Island. It sought to curtail Lincoln's practice of accepting wagers on races run at out-of-state tracks. Suffolk advanced two theories, asseverating that Lincoln's activities transgressed the IHA and also constituted a pattern of indictable activity under federal gambling laws, *see, e.g.,* 18 U.S.C. § 1084(a) (1988), and, therefore, justified injunctive relief under RICO. *See* 18 U.S.C. §§ 1961(1), 1962(a). The district court rejected this two-pronged assault. It held that Suffolk lacked standing to assert a claim under the IHA and that Lincoln's acceptance of interstate off-track wagers without Suffolk's blessing was not the stuff from which a RICO suit could be fashioned. *See Sterling Suffolk Racecourse Ltd. Partnership v. Burrillville Racing Ass'n, Inc.,* 802 F.Supp. 662, 669–71 (D.R.I.1992). Hence, the district court denied Suffolk's prayer for injunctive relief and granted Lincoln's motion for summary judgment. *Id.* at 673. This appeal ensued.

## II. OFF AND RUNNING

■ We devote our initial explicatory efforts to the leading question in the case: Does the IHA give so-called "60–mile

tracks," *i.e.,* tracks operating within sixty miles of an OTB office, an implied right of action for injunctive relief? Because this issue is purely legal, we consider it *de novo. See, e.g., Liberty Mutual Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 757 (1st Cir.1992).

■ In determining whether a private cause of action is implied in a federal statute, a court's central focus must be on congressional intent. *See, e.g., Karahalios v. National Fed'n of Fed. Employees,* 489 U.S. 527, 532–33, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989) ("Unless ... congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.") (citation and internal quotation marks omitted); *Stowell v. Ives,* 976 F.2d 65, 70 n. 5 (1st Cir.1992) ("There is a presumption against implied rights of action—a presumption that will endure unless the plaintiff proffers adequate evidence of a contrary congressional intent."). To discern this intent, courts employ the customary tools of statutory interpretation, *see, e.g., Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 515, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979), frequently asking, however, three questions which often have special salience in connection with implied rights of action. These queries are: (1) Is the plaintiff one of the class for whose especial benefit the legislation was enacted? (2) Is the remedy sought consistent with the underlying purposes of the legislative scheme? (3) Is the cause of action one traditionally relegated to state law? *See Thompson,* 484 U.S. at 179, 108 S.Ct. at 515; *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45·L.Ed.2d 26 (1975); *Latinos Unidos de Chelsea v. Secretary of HUD,* 799 F.2d 774, 792 (1st

---

pendix for more precise definitions of each term.

**2.** The trade association is called the "horsemen's group." *See* 15 U.S.C. § 3002(12).

**3.** In December 1991, Lincoln sought Suffolk's approval, but made no sufficiently spectacular bid. Hence, the parties failed to reach an accord.

Cir.1986).[4]

Here, the district court followed this roadmap expertly. *See Sterling*, 802 F.Supp. at 666–69. Its opinion is astute. Its views are articulated with clarity and precision. It builds upon other persuasively reasoned caselaw reaching the identical result. *See, e.g., New Suffolk Downs Corp. v. Rockingham Venture, Inc.*, 656 F.Supp. 1190, 1194 (D.N.H.1987). Under these auspicious circumstances, we see no need to reinvent the wheel. Rather, we affirm the lower court's holding that the IHA implies no private right of action in favor of 60–mile tracks for essentially the reasons elucidated in the opinion below. We pause, however, to add some observations and clarifications.

**First:** Although we concur in Judge Lagueux's bottom-line assessment that the IHA does not give 60–mile tracks a private right of action, and in his related evaluation of two of the three *Cort* factors—the remedy that Suffolk seeks seems to be at odds with the IHA's underlying purposes and the cause of action questions what activities may lawfully be carried out at a state-regulated gambling facility, a matter traditionally relegated to state law—we think it is advisable to begin by remarking a point of disagreement. Unlike Judge Lagueux, 802 F.Supp. at 667, we believe Congress, even though it did not choose to confer a private right of action, *see infra*, nevertheless designed section 3004(b)(1)(A) for the benefit of 60–mile tracks. *See Cort*, 422 U.S. at 78, 95 S.Ct. at 2087; *see also Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1061–62 (1st Cir. 1991) (discussing "especial benefit" test).

■ The especial benefit inquiry in implied right of action cases need not be a search for a single class of plaintiffs—the class which the entire statute is most directed toward assisting. Rather, different parts of a statutory scheme can be aimed at benefitting different classes of persons.

*See, e.g., Cohen v. Massachusetts Bay Transp. Auth.*, 647 F.2d 209, 212 (1st Cir. 1981) (noting that a particular section of a statute primarily benefitted consumers while a different section of the same statute primarily benefitted transit workers); *Comtronics, Inc. v. Puerto Rico Tel. Co.*, 553 F.2d 701, 705 (1st Cir.1977) (discussing a statute that especially benefitted two separate groups). The inquiry, then, focuses on whether *any* language in the statute sufficiently indicates a motivating congressional purpose to benefit the class in question as opposed to, say, a mere congressional expression of knowledge anent, or passive approval of, a tangential benefit. *See California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981); *Cannon v. University of Chicago*, 441 U.S. 677, 690–94, 99 S.Ct. 1946, 1954–56, 60 L.Ed.2d 560 (1979). Properly conducted, this type of investigation weeds out statutes which protect a general public interest and only incidentally create advantages for particular people. *See, e.g., Cannon*, 441 U.S. at 690, 99 S.Ct. at 1954; *Arroyo–Torres v. Ponce Fed. Bank*, 918 F.2d 276, 278 (1st Cir.1990).

■ When we shine the light of this understanding on the IHA, we think that 60–mile tracks meet the "especial benefit" criterion. Section 3004(b)(1)(A) requires an OTB office to procure the approval of all 60–mile tracks before accepting interstate off-track wagers. This requirement, by its own terms, adequately evinces congressional intent to safeguard the interests of 60–mile tracks and, therefore, must be viewed as redounding to their especial benefit. The legislative history fortifies this conclusion. *See, e.g.*, S.Rep.No. 1117, 95th Cong., 2d Sess. 4–5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4132, 4144, 4147–48. No more is exigible. *See Cannon*, 441 U.S. at 690–94, 99 S.Ct. at 1954–56 (finding espe-

---

**4.** To be sure, the *Cort* Court also asked a fourth question: Is there evidence of legislative intent to create or deny a private right of action? *See Cort*, 422 U.S. at 78, 95 S.Ct. at 2087; *see also Latinos Unidos*, 799 F.2d at 792. The Justices have since made clear, however, that the fourth question is really a tote board for tallying the answers to all the other inquiries and, therefore, need not be considered separately. *See Thompson*, 484 U.S. at 179, 108 S.Ct. at 515; *California v. Sierra Club*, 451 U.S. 287, 293, 101 S.Ct. 1775, 1778, 68 L.Ed.2d 101 (1981); *see also Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1060 (1st Cir.1991).

cial benefit conferred by language more general than that contained in the IHA).

Still, we hasten to add that this fact alone does not strike the gold. In this case, the especial benefit element is at most a dim counterpoint to the bold-faced evidence of congressional intent intricately interwoven into the IHA's language and structure. Therefore, the district court's miscalculation constitutes harmless error.

■ **Second:** ·We turn now to the other indicators of legislative intent. It is a familiar precept that, in cases of statutory interpretation, the language of the statute enjoys preeminence. *See Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245–46, 62 L.Ed.2d 146; *Touche Ross*, 442 U.S. at 568, 99 S.Ct. at 2485. Here, notwithstanding the especial benefit point, the words of the statute speak strongly against implying a private right of action. We explain briefly.

■ When a statute expressly provides remedies, courts must be extremely reluctant to expand its sweep by augmenting the list of prescribed anodynes. To the exact contrary, a court confronted with such a situation should ordinarily conclude that the legislature provided precisely the redress it considered appropriate. *See, e.g., Karahalios*, 489 U.S. at 533, 109 S.Ct. at 1286 (collecting cases); *Middlesex County Sewerage Auth. v. Sea Clammers*, 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623–24, 69 L.Ed.2d 435 (1981); *Nashoba Communications, Ltd. v. Town of Danvers*, 893 F.2d 435, 440 (1st Cir.1990). This is such a case. The IHA explicitly identifies the parties entitled to bring actions for damages or injunctions, *see* 15 U.S.C. § 3006—and 60–mile tracks are not among them. When discussing the potential liability of violators and outlining the damages they must pay, the IHA identifies as potential recipients of damage awards only these same parties. *See* 15 U.S.C. § 3005. And, moreover, the

statute employs a damage calculation formula, *see id.*, that is totally irrelevant to entities like 60–mile tracks. It strains credulity to argue that these serial omissions are serendipitous.

The IHA's venue and jurisdictional provisions point in the same direction. The statute provides that venue is appropriate only in a district in which either the host track or the display track is located. *See* 15 U.S.C. § 3007(b). It further provides that jurisdiction is appropriate only in the courts of the host state or the off-track state.[5] *See* 15 U.S.C. § 3007(c). In particular contexts, a statute's silence can be informative. So it is here: the absence of any provision for venue or jurisdiction based on the location of an aggrieved 60–mile track tells a tale.

In sum, given the language of the statute—what the IHA says and what it shies away from saying—there is no sure footing for the implication of a private right of action favoring nonconsenting 60–mile tracks.

**Third:** The structure of a statute can also be of inestimable value in its interpretation. *See Crandon v. United States*, 494 U.S. 152, 156–57, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 824 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993). In this instance, the statute's structure seems highly significant. The provision requiring OTB offices to secure the approbation of the horsemen's group, host racing association, host racing commission, and off-track racing commission is set conspicuously apart from the provision requiring display tracks to seek the approval of 60–mile tracks. *Compare* 15 U.S.C. § 3004(a) *with* 15 U.S.C. § 3004(b).

■ The language of the statutory provisions bolsters the conclusion that these structural differences are pregnant with meaning. Congress phrased the former provision as an absolute condition prece-

---

**5.** The "off-track State" is the state in which the "interstate off-track wager is accepted." 15 U.S.C. § 3002(6).

dent to off-track wagering across state lines, *see* 15 U.S.C. § 3004(a) (an "interstate off-track wager may be accepted by an off-track betting system *only if* consent is obtained from [four entities]") (emphasis supplied), but phrased the latter provision merely as a directive to a private party. *See* 15 U.S.C. § 3004(b)(1) ("any off-track betting office shall obtain the approval of [tracks within a 60–mile radius]"). As the Court has indicated, a statutory provision phrased as a command to specific people, like the one upon which Suffolk rests its hopes, is unlikely to breed an implied private right of action because such language usually evinces a congressional concern with instructing the putative violator rather than with providing a remedy to the putative victim. *See, e.g., Universities Research Ass'n v. Coutu*, 450 U.S. 754, 772–73 & n. 23, 101 S.Ct. 1451, 1462–63 & n. 23, 67 L.Ed.2d 662 (1981); *Cannon*, 441 U.S. at 690–93, 99 S.Ct. at 1954–55.

**Fourth:** In this case, the whole is certainly no less than the sum of its constituent parts. The language of almost every section of the IHA, and the structure of the pivotal provisions, strongly suggest that Congress did not intend to provide disapproving 60–mile tracks with a private right of action against display tracks. Having discerned so striking an indication of congressional intent, deeply rooted in the text of the statute itself, we find Suffolk's reliance on fragmentary excerpts from the legislative history to be little more than grains of desert sand in the teeth of a haboob. Even clear legislative history— and the history here is less than pellucid— must yield to a contrary implication easily derivable from a statute's text. *See Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988); *see also* 2A Norman J. Singer, *Sutherland Statutory Construction* §§ 46.04, 46.07 (5th ed. 1992) (concluding that courts, when construing statutes, must adhere primarily to language and structure).

**Fifth:** We reject appellant's plea that denying an implied right of action will render nugatory the statutory provisions dealing with 60–mile tracks. Appellant's reliance upon a finding of especial benefit, *see supra* pp. 1269–70, to prove this point is misplaced. That Congress purposely sought to confer a benefit on entities like Suffolk does not imply that such was the only—or even the overriding—motive for enacting the statute. *See, e.g., Cort*, 422 U.S. at 81–82 & n. 13, 95 S.Ct. at 2089–2090 & n. 13; *Cohen*, 647 F.2d at 212. Nor does Congress's intent to benefit 60–mile tracks inevitably imply that Congress deemed a private right of action to be a necessary or advisable means of accomplishing its goal. *See Coutu*, 450 U.S. at 771, 101 S.Ct. at 1462 (explaining that "[t]he fact that an enactment is designed to benefit a particular class does not end the inquiry; instead it must also be asked whether the language of the statute indicates that Congress intended that it be enforced through private litigation"); *accord Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 540–41, 104 S.Ct. 831, 840–41, 78 L.Ed.2d 645 (1984); *Transamerica*, 444 U.S. at 24, 100 S.Ct. at 249.

By making manifest that OTB offices operating without the approval of 60–mile tracks are flouting federal law, Congress supplied other parties with a potential defense should they cancel contracts with the offending facility or withhold consent to interstate off-track wagering at such a facility. *Cf., e.g., Alabama Sportservice, Inc. v. National Horsemen's Benevolent & Protective Ass'n, Inc.*, 767 F.Supp. 1573, 1579–80 (M.D.Fla.1991) (suggesting that withholding of consent on reasonable grounds would not be an actionable restraint of trade). Moreover, creating the framework for assertion of such a defense benefits the 60–mile tracks by furnishing an incentive for display tracks to comply with the requirement.[6] *See generally Daily Income Fund*, 464 U.S. at 535, 541 & n. 11, 104 S.Ct. at 838, 841 & n. 11 (explaining that the statutory objective to benefit a

---

6. Lincoln itself has been hoist on this petard. Several organizations withdrew consent because of Lincoln's failure to obtain Suffolk's approval, thereby depriving Lincoln of the right to accept wagers on races originating at the non-consenting tracks.

class may be served by giving other parties the right to sue). Similarly, display tracks and 60–mile tracks are frequently located in the same state and, therefore, subject to the same regulatory authority. Where that occurs, the IHA has the effect of permitting the racing commission either to insist on pre-approval or to work out some other satisfactory solution. Even when a 60–mile track does not have this home field advantage, the off-track racing commission may well be persuaded to take regulatory action against a display track which, like Lincoln, scorns a federal mandate. *Cf., e.g., CBS Inc. v. FCC*, 453 U.S. 367, 373–75, 101 S.Ct. 2813, 2818–20, 69 L.Ed.2d 706 (1981); *FCC v. Pacifica Foundation*, 438 U.S. 726, 730–31, 98 S.Ct. 3026, 3030–31, 57 L.Ed.2d 1073 (1978).

In sum, our holding that no private right of action exists does not sanction blatant disregard of federal law or render the approval requirement without worth to the 60–mile tracks. It merely ensures that negotiations for a green light from market-area tracks will occur in the context Congress envisioned, with neither party completely beholden to the other. After all, were we to infer a right of action along the lines that Suffolk delineates, we would hand 60–mile tracks an important veto power over the operation of nearby OTB offices and, in the bargain, tilt the delicate balance Congress so painstakingly constructed.

We will not belabor the point. In the long run, Congress may well have thought that the indirect benefits flowing from a right of approval that had little bite were preferable to the potential vices involved in granting 60–mile tracks the right to gnaw at will. *See generally* Jerry L. Mashaw, *Textualism, Constitutionalism, and the Interpretation of Federal Statutes*, 32 Wm. & Mary L.Rev. 827, 842 (1991) (suggesting that implied private rights of action can eclipse the important role of agencies in weighing conflicting concerns); Frank H. Easterbrook, *Foreword: The Court and the Economic System*, 98 Harv.L.Rev. 4, 45–51 (1984) (warning that courts, in ven-

turing to alter the particular personality which Congress has chosen to embody in statutes, may shift the balance of entitlements and sire overdeterrence).

## III. THE HOME STRETCH

 We turn next, albeit briefly, to the question of whether appellant, on these facts, framed a cognizable claim under the RICO statute. Suffolk argues that Lincoln's unapproved acceptance of wagers constitutes a pattern of indictable activity under federal gambling laws and, therefore, violates the RICO statute. The court below did not agree. *See Sterling*, 802 F.Supp. at 669–70. We think the lower court reached the right result: Lincoln's acceptance of wagers on distant races without Suffolk's consent does not constitute a crime which can carry the weight of a RICO complaint.[7]

RICO targets the use, in connection with any enterprise affecting interstate commerce, of income derived "from a pattern of racketeering activity." 18 U.S.C. § 1962(a). The term "racketeering activity" is defined in 18 U.S.C. § 1961(1). Included in the definition is any act indictable under 18 U.S.C. § 1084, a statute which criminalizes, *inter alia*, utilization of a wire facility for the "transmission in interstate ... commerce of ... information assisting in the placing of bets ... on any sporting event." 18 U.S.C. § 1084(a). Conceding, withal, that wagering of the sort transacted at Lincoln's facility is permissible under the relevant laws of all interested states, appellant pins its RICO-related hopes on section 1084(a). But, section 1084(a) carves out a specific exception for circumstances in which wagering on a sporting event is legal in both the sending state and the receiving state. *See* 18 U.S.C. § 1084(b). That exception applies here.

Leaving the IHA to one side, appellant has no case. The legislative history of section 1084 shows beyond peradventure that Congress enacted section 1084(b) for the express purpose of allowing off-track betting in venues where states chose to

7. Here, again, the issue is purely legal and appellate review is plenary.

legalize such activity (thereby reserving to individual states some measure of control over what forms of gambling could occur within their borders). *See* H.R.Rep. No. 967, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S.C.C.A.N. 2631, 2632–33. Thus, given that the operation of Lincoln's OTB office does not offend relevant state law, we have no non-IHA-related reason to declare that the actions complained of in this suit constitute indictable conduct under section 1084.

Appellant tells us that the IHA makes a dispositive difference. But, we do not understand how this can be true. All available evidence indicates that Congress intended the IHA to have purely civil consequences. For instance, the IHA's enforcement and remedies sections specifically exclude the possibility of governmental involvement and/or the specter of criminal penalties. *See* 15 U.S.C. §§ 3005, 3006. The section dealing with jurisdiction and venue refers only to "civil action[s]." 15 U.S.C. § 3007. The legislative history teaches that Congress intended there to "be no Government enforcement" of the IHA; and further intended that "[a]ny person accepting an interstate wager other than in conformity with the act will *instead* be civilly liable in a private action for damages to the host State, the host racing association, and the applicable horsemen's group." S.Rep. No. 1117, 1978 U.S.C.C.A.N. at 4146 (emphasis supplied); *see also* H.R.Rep. No. 1733, 95th Cong., 2d Sess. 3 (1978) (same). In the face of this imposing array, Suffolk's argument that the IHA serves as a fulcrum to criminalize Lincoln's activities must fail.

To recapitulate, we think it clear that Congress, in adopting section 1084, did not intend to criminalize acts that neither the affected states nor Congress itself deemed criminal in nature. Lincoln's acts fall into this chiaroscuro category—perhaps not right, but certainly not felonious. It follows that these acts, not indictable under section 1084, cannot constitute a pattern of racketeering activity within RICO's definitional parameters. Hence, the court below properly granted summary judgment on the RICO count.[8]

## IV. AT THE WIRE

We need go no further. Simply stated, Congress's discernible intent precludes us from inferring a private right of action in appellant's favor. Because this is so, and because appellant's complaint likewise fails to limn a cognizable racketeering claim, the judgment below, to invoke the name of a very famous racehorse, must be

**Affirmed.**

## APPENDIX
### CHAPTER 57—INTERSTATE HORSERACING

Sec.
3001. Congressional findings and policy.
3002. Definitions.
3003. Acceptance of interstate off-track wager.
3004. Regulation of interstate off-track wagering.
 (a) Consent of host racing association, host racing commission, and off-track racing commission as prerequisite to acceptance of wager.
 (b) Approval of tracks as prerequisite to acceptance of wager; exceptions.
 (c) Takeout amount.
3005. Liability and damages.
3006. Civil action.
 (a) Parties; remedies.
 (b) Intervention.
 (c) Limitations.

**8.** The district court held, in the alternative, that RICO does not confer a right to sue for equitable relief on private plaintiffs and that, therefore, even if Suffolk had raised a colorable RICO claim, no injunction could issue. *See Sterling,* 802 F.Supp. at 670–71; *see also Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 848 (1st Cir.1990) (expressing doubts about the availability of such relief). Because we affirm, without caveat, the district court's primary holding concerning the RICO claim, we do not address this alternate ground.

**1274**

Sec.
 (d) State as defendant.
3007. Jurisdiction and venue.
 (a) District court jurisdiction.
 (b) Venue; service of process.
 (c) Concurrent state court jurisdiction.

## § 3001. Congressional findings and policy

**(a)** The Congress finds that—

(1) the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders;

(2) the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests; and

(3) in the limited area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers.

**(b)** It is the policy of the Congress in this chapter to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States.

(Pub.L. 95–515, § 2, Oct. 25, 1978, 92 Stat. 1811.)

### Historical Note

**Effective Date.** Section 9 of Pub.L. 95–515 provided that:

"(a) The provisions of this Act [this chapter] shall take effect on the date of enactment of this Act [Oct. 25, 1978], and, except as provided in subsection (b) of this section, shall apply to any interstate off-track wager accepted on or after such date of enactment.

"(b)(1) The provisions of this Act [this chapter] shall not apply to any interstate off-track wager which is accepted pursuant to a contract existing on May 1, 1978.

"(2) The provisions of this Act [this chapter] shall not apply to any form of legal non-parimutuel off-track betting existing in a State on May 1, 1978.

"(3) The provisions of subsection (b) of section 5 of this Act [section 3004(b) of this title] shall not apply to any parimutuel off-track betting system existing on May 1, 1978, in a State which does not conduct parimutuel horseracing on the date of enactment of this Act [Oct. 25, 1978]."

**Short Title.** Section 1 of Pub.L. 95–515 provided that: "This Act [enacting this chapter] may be cited as the 'Interstate Horseracing Act of 1978'."

**Legislative History.** For legislative history and purpose of Pub.L. 95–515, see 1978 U.S.Code Cong. and Adm.News, p. 4132.

### Library References

Commerce ⟐62.7.
Gaming ⟐6.

C.J.S. Commerce §§ 89, 98.
C.J.S. Gaming §§ 1, 3 et seq.

## § 3002. Definitions

For the purposes of this chapter the term—

(1) "person" means any individual, association, partnership, joint venture, corporation, State or political subdivision thereof, department, agency, or instrumentality of a State or political subdivision thereof, or any other organization or entity;

(2) "State" means each State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

(3) "interstate off-track wager" means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State;

(4) "on-track wager" means a wager with respect to the outcome of a horserace which is placed at the racetrack at which such horserace takes place;

(5) "host State" means the State in which the horserace subject to the interstate wager takes place;

(6) "off-track State" means the State in which an interstate off-track wager is accepted;

(7) "off-track betting system" means any group which is in the business of accepting wagers on horseraces at locations other than the place where the horserace is run, which business is conducted by the State or licensed or otherwise permitted by State law;

(8) "off-track betting office" means any location within an off-track State at which off-track wagers are accepted;

(9) "host racing association" means any person who, pursuant to a license or other permission granted by the host State, conducts the horserace subject to the interstate wager;

(10) "host racing commission" means that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate the conduct of racing within the host State;

(11) "off-track racing commission" means that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State;

(12) "horsemen's group" means, with reference to the applicable host racing association, the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day;

(13) "parimutuel" means any system whereby wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator;

(14) "currently operating tracks" means racing associations conducting parimutuel horseracing at the same time of day (afternoon against afternoon; nighttime against nighttime) as the racing association conducting the horseracing which is the subject of the interstate off-track wager;

(15) "race meeting" means those scheduled days during the year a racing association is granted permission by the appropriate State racing commission to conduct horseracing;

(16) "racing day" means a full program of races at a specified racing association on a specified day;

(17) "special event" means the specific individual horserace which is deemed by the off-track betting system to be of sufficient national significance and interest to warrant interstate off-track wagering on that event or events;

(18) "dark days" means those days when racing of the same type does not occur in an off-track State within 60 miles of an off-track betting office during a race meeting, including, but not limited to, a dark weekday when such racing association or associations run on Sunday, and days when a racing program is scheduled but does not take place, or cannot be completed due to weather, strikes and other factors not within the control of the off-track betting system;

(19) "year" means calendar year;

(20) "takeout" means that portion of a wager which is deducted from or not included in the parimutuel pool, and which is distributed to persons other than those placing wagers;

(21) "regular contractual process" means those negotiations by which the applicable horsemen's group and host racing association reach agreements on issues regarding the conduct of horseracing by the horsemen's group at that racing association;

(22) "terms and conditions" includes, but is not limited to, the percentage which is paid by the off-track betting system to the host racing association, the percentage which is paid by the host racing association to the horsemen's group, as well as any arrangements as to the exclusivity between the host racing association and the off-track betting system.

(Pub.L. 95–515, § 3, Oct. 25, 1978, 92 Stat. 1811.)

**1276**

### Historical Note

**Effective Date.** Section effective Oct. 25, 1978, see section 9 of Pub.L. 95–515, set out as an Effective Date note under section 3001 of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 95–515, see 1978 U.S.Code Cong. and Adm.News, p. 4132.

## § 3003. Acceptance of interstate off-track wager

No person may accept an interstate off-track wager except as provided in this chapter. (Pub.L. 95–515, § 4, Oct. 25, 1978, 92 Stat. 1813.)

### Historical Note

**Effective Date.** Section effective Oct. 25, 1978, see section 9 of Pub.L. 95–515, set out as an Effective Date note under section 3001 of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 95–515, see 1978 U.S.Code Cong. and Adm.News, p. 4132.

## § 3004. Regulation of interstate off-track wagering

**Consent of host racing association, host racing commission, and off-track racing commission as prerequisite to acceptance of wager**

(a) An interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from—

 (1) the host racing association, except that—

 (A) as a condition precedent to such consent, said racing association (except a not-for-profit racing association in a State where the distribution of off-track betting revenues in that State is set forth by law) must have a written agreement with the horsemen's group, under which said racing association may give such consent, setting forth the terms and conditions relating thereto; provided,

 (B) that where the host racing association has a contract with a horsemen's group at the time of enactment of this chapter which contains no provisions referring to interstate off-track betting, the terms and conditions of said then-existing contract shall be deemed to apply to the interstate off-track wagers and no additional written agreement need be entered into unless the parties to such then-existing contract agree otherwise. Where such provisions exist in such existing contract, such contract shall govern. Where written consents exist at the time of enactment of this chapter between an off-track betting system and the host racing association providing for interstate off-track wagers, or such written consents are executed by these parties prior to the expiration of such then-existing contract the written agreement of such horsemen's group shall thereafter be required as such condition precedent and as a part of the regular contractual process, and may not be withdrawn or varied except in the regular contractual process. Where no such written consent exists, and where such written agreement occurs at a racing association which has a regular contractual process with such horsemen's group, said agreement by the horsemen's group may not be withdrawn or varied except in the regular contractual process;

 (2) the host racing commission;

 (3) the off-track racing commission.

**Approval of tracks as prerequisite to acceptance of wager; exceptions**

(b)(1) In addition to the requirement of subsection (a) of this section, any off-track betting office shall obtain the approval of—

 (A) all currently operating tracks within 60 miles of such off-track betting office; and

(B) if there are no currently operating tracks within 60 miles then the closest currently operating track in an adjoining State.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, any off-track betting office in a State with at least 250 days of on-track parimutuel horseracing a year, may accept interstate off-track wagers for a total of 60 racing days and 25 special events a year without the approval required by paragraph (1), if with respect to such 60 racing days, there is no racing of the same type at the same time of day being conducted within the off-track betting State within 60 miles of the off-track betting office accepting the wager, or such racing program cannot be completed. Excluded from such 60 days and from the consent required by subsection (b)(1) of this section may be dark days which occur during a regularly scheduled race meeting in said off-track betting State. In order to accept any interstate off-track wager under the terms of the preceding sentence the off-track betting office shall make identical offers to any racing association described in subparagraph (A) of subsection (b)(1) of this section. Nothing in this subparagraph shall be construed to reduce or eliminate the necessity of obtaining all the approvals required by subsection (a) of this section.

### Takeout amount

(c) No parimutuel off-track betting system may employ a takeout for an interstate wager which is greater than the takeout for corresponding wagering pools of off-track wagers on races run within the off-track State except where such greater takeout is authorized by State law in the off-track State.

(Pub.L. 95–515, § 5, Oct. 25, 1978, 92 Stat. 1813.)

### Historical Note

**Effective Date.** Section effective Oct. 25, 1978, see section 9 of Pub.L. 95–515, set out as an Effective Date note under section 3001 of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 95–515, see 1978 U.S.Code Cong. and Adm.News, p. 4132.

### Library References

Commerce ⟐62.7.
Gaming ⟐6.

C.J.S. Commerce §§ 89, 98.
C.J.S. Gaming §§ 1, 3 et seq.

## § 3005. Liability and damages

Any person accepting any interstate off-track wager in violation of this chapter shall be civilly liable for damages to the host State, the host racing association and the horsemen's group. Damages for each violation shall be based on the total of off-track wagers as follows:

(1) If the interstate off-track wager was of a type accepted at the host racing association, damages shall be in an amount equal to that portion of the takeout which would have been distributed to the host State, host racing association and the horsemen's group, as if each such interstate off-track wager had been placed at the host racing association.

(2) If such interstate off-track wager was of a type not accepted at the host racing association, the amount of damages shall be determined at the rate of takeout prevailing at the off-track betting system for that type of wager and shall be distributed according to the same formulas as in paragraph (1) above.

(Pub.L. 95–515, § 6, Oct. 25, 1978, 92 Stat. 1814.)

### Historical Note

**Effective Date.** Section effective Oct. 25, 1978, see section 9 of Pub.L. 95–515, set out as an Effective Date note under section 3001 of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 95–515, see 1978 U.S.Code Cong. and Adm.News, p. 4132.

**1278**

**Library References**

Gaming ⟜42(1). C.J.S. Gaming § 29 et seq.

## § 3006. Civil action

### Parties; remedies

(a) The host State, the host racing association, or the horsemen's group may commence a civil action against any person alleged to be in violation of this chapter, for injunctive relief to restrain violations and for damages in accordance with section 3005 of this title.

### Intervention

(b) In any civil action under this section, the host State, the host racing association and horsemen's group, if not a party, shall be permitted to intervene as a matter of right.

### Limitations

(c) A civil action may not be commenced pursuant to this section more than 3 years after the discovery of the alleged violation upon which such civil action is based.

### State as defendant

(d) Nothing in this chapter shall be construed to permit a State to be sued under this section other than in accordance with its applicable laws.

(Pub.L. 95–515, § 7, Oct. 25, 1978, 92 Stat. 1814.)

### Historical Note

**Effective Date.** Section effective Oct. 25, 1978, see section 9 of Pub.L. 95–515, set out as an Effective Date note under section 3001 of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 95–515, see 1978 U.S.Code Cong. and Adm.News, p. 4132.

### West's Federal Forms

Affirmative defenses, statute of limitations, see §§ 2109 to 2112.
Intervention, see § 3111 et seq.
Preliminary injunctions and temporary restraining orders, matters pertaining to, see § 5271 et seq.

**Library References**

Gaming ⟜41, 46(1). C.J.S. Gaming §§ 46, 48, 54.

## § 3007. Jurisdiction and venue

### District court jurisdiction

(a) Notwithstanding any other provision of law, the district courts of the United States shall have jurisdiction over any civil action under this chapter, without regard to the citizenship of the parties or the amount in controversy.

### Venue; service of process

(b) A civil action under this chapter may be brought in any district court of the United States for a district located in the host State or the off-track State, and all process in any such civil action may be served in any judicial district of the United States.

### Concurrent state court jurisdiction

(c) The jurisdiction of the district courts of the United States pursuant to this section shall be concurrent with that of any State court of competent jurisdiction located in the host State or the off-track State.

(Pub.L. 95–515, § 8, Oct. 25, 1978, 92 Stat. 1814.)

## Historical Note

**Effective Date.** Section effective Oct. 25, 1978, see section 9 of Pub.L. 95–515, set out as an Effective Date note under section 3001 of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 95–515, see 1978 U.S.Code Cong. and Adm.News, p. 4132.

## West's Federal Forms

Jurisdiction and venue in district courts, matters pertaining to, see § 1001 et seq.
Service of process, see § 1301 et seq.

## Library References

Gaming ☞44.

C.J.S. Gaming § 52.